UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

MICHAEL CASTILLERO,
FRANCINE LANAIA, and
BRIAN MARTINSEN,

                Defendants.

**23 Cr. 622 (JMF)**

# THE GOVERNMENT'S SENTENCING SUBMISSION

JAY CLAYTON
United States Attorney for the
Southern District of New York
26 Federal Plaza
New York, New York 10278

Adam S. Hobson
Allison Nichols
Matthew R. Shahabian
Assistant United States Attorneys
    *Of Counsel*

**TABLE OF CONTENTS**

Prelminary Statement.................................................................................................................... 1

The Offense Conduct .................................................................................................................... 3

   I. Background............................................................................................................................ 3

   II. Facts Relevant to Fraud Counts ......................................................................................... 4

      A.       Lanaia's and Castillero's FINRA Bars ................................................................ 4

      B.       Puppet Fund Manager and Control Over the StraightPath Entities ................... 5

      C.       Lies to Investors about Markups and Fees........................................................... 7

      D.       Commingling and Share Shortfalls...................................................................... 9

      E.       StraightPath Communication with Investors and Investor Testimony ............ 11

   III. Facts Relevant to Deception and Lies to Regulators and Obstruction Counts ................... 13

      A.       SEC Examination.................................................................................................. 13

      B.       Martinsen's False FINRA Testimony................................................................. 15

      C.       SEC Enforcement Investigation and Subpoena ................................................. 16

   IV. Facts Relevant to Investor Losses, Forfeiture, and Restitution ......................................... 18

The Defendants' Factual Objections to the PSR........................................................................ 20

   I. Applicable Law ................................................................................................................... 21

   II. Discussion .......................................................................................................................... 21

The Guidelines Calculation........................................................................................................ 28

      A.       Loss Amount....................................................................................................... 29

      B.       Sophisticated Means ........................................................................................... 30

      C.       Obstruction of Justice - Lanaia ......................................................................... 32

      D.       Obstruction of Justice - Martinsen .................................................................... 35

A Significant Sentence of Imprisonment Is Necessary............................................................. 35

   I. The Nature, Circumstances, and Seriousness of the Offense Warrant a Significant Sentence
   .................................................................................................................................................. 36

   II. General Deterrence Requires a Significant Sentence.......................................................... 45

   III. Specific Deterrence Requires a Serious Sentence ............................................................. 46

The Court Should Also Impose Forfeiture and Restitution ....................................................... 47

   I. Forfeiture Money Judgment ............................................................................................... 48

   II. Forfeiture of Specific Property........................................................................................... 51

   III. Restitution......................................................................................................................... 52

Conclusion .................................................................................................................................. 54

i

# TABLE OF AUTHORITIES

**CASES**                                                                                                    **PAGE(S)**

*Gall v. United States*,
   552 U.S. 38 (2007) ........................................................................................................ 28

*Honeycutt v. United States*,
   581 U.S. 443 (2017) ................................................................................................ 47, 50

*Libretti v. United States*,
   516 U.S. 29 (1995) ........................................................................................................ 48

*United States v. Adelson*,
   441 F. Supp. 2d 506 (S.D.N.Y. 2006) ........................................................................ 43

*United States v. Awad*,
   598 F.3d 76 (2d Cir. 2010) ........................................................................................... 48

*United States v. Berndt*,
   127 F.3d 251 (2d Cir. 1997) ......................................................................................... 21

*United States v. Bodouva*,
   853 F.3d 76 (2d Cir. 2017) ..................................................................................... 49, 50

*United States v. Bonventre*,
   646 F. App'x 73 (2d Cir. 2016) .................................................................................... 48

*United States v. Booker*,
   543 U.S. 220 (2005) ...................................................................................................... 28

*United States v. Capoccia*,
   503 F.3d 103 (2d Cir. 2007) ............................................................................. 47, 48, 51

*United States v. Carmona*,
   873 F.2d 569 (2d Cir. 1989) ......................................................................................... 21

*United States v. Crosby*,
   397 F.3d 103 (2d Cir. 2005) ......................................................................................... 21

*United States v. Daugerdas*,
   No. 09 Cr. 581 (WHP), 2012 WL 5835203 (S.D.N.Y. Nov. 7, 2012) ....................... 49

*United States v. Fiore*,
   381 F.3d 89 (2d Cir. 2004) ........................................................................................... 34

*United States v. Garcia*,
   413 F. 3d 201 (2d Cir. 2005) ........................................................................................ 21

*United States v. Ghailani*,
   733 F.3d 29 (2d Cir. 2013) ........................................................................................... 21

*United States v. Goffer*,
   721 F.3d 113 (2d Cir. 2013) ......................................................................................... 44

*United States v. Grant*, No.,
   05 Cr. 1192 (NRB), 2008 WL 4376365 n.1 (S.D.N.Y. Sept. 25, 2008) ..................... 49

*United States v. Jackson*,
   346 F.3d 22 (2d Cir. 2003) ........................................................................................... 32

*United States v. Leonard*,
   529 F.3d 83 (2d Cir. 2008) ........................................................................................... 29

*United States v. Martin*,
   455 F.3d 1227 (11th Cir. 2006) .................................................................................... 44
*United States v. Milstein*,
   481 F.3d 132 (2d Cir. 2007) ......................................................................................... 52
*United States v. Milton*,
   21 Cr. 478 (ER), 2024 WL 779210 (S.D.N.Y. Feb. 26, 2024) ..................................... 49
*United States v. Roberts*,
   660 F.3d 149 (2d Cir. 2011) ......................................................................................... 48
*United States v. Stitsky*,
   536 F. App'x 98 (2d Cir. 2013) ............................................................................... 30, 31
*United States v. Tanner*,
   942 F.3d 60 (2d Cir. 2019) ........................................................................................... 50
*United States v. Torres*,
   703 F.3d 194 (2d Cir. 2012) ......................................................................................... 47
*United States v. Tracy*,
   12 F.3d 1186 (2d Cir. 1993) ......................................................................................... 21
*United States v. Treacy*,
   639 F.3d 32 (2d Cir. 2011) ........................................................................................... 48
*United States v. Uddin*,
   551 F.3d 176 (2d Cir. 2009) ......................................................................................... 48
*United States v. Vaughn*,
   430 F.3d 518 (2d Cir. 2005) ......................................................................................... 21
*United States v. Viloski*,
   814 F.3d 104 (2d Cir. 2016) ......................................................................................... 48
*United States v. Ware*,
   577 F.3d 442 (2d Cir. 2009) ......................................................................................... 34

Statutes

18 U.S.C. § 981(a)(1)(C) ...................................................................................... 48, 51
18 U.S.C. § 981(a)(2) ................................................................................................ 48
18 U.S.C. § 981(a)(2)(A) ........................................................................................... 49
18 U.S.C. § 3553(a) ................................................................................................... 35
18 U.S.C. § 3553(a)(1) & 3553(a)(2)(A) .............................................................. 36, 41
18 U.S.C. § 3663A(a)(1) ............................................................................................ 52
18 U.S.C. § 3663A(a)(2) ............................................................................................ 52
18 U.S.C. §§ 1956(c)(7) ............................................................................................ 48
28 U.S.C. § 2461(c) ............................................................................................. 47, 48

Rules

Fed. R. Crim. P. 32.2(b)(1)(A) ............................................................................. 47, 51
Fed. R. Crim. P. 32.2(b)(1)(B) ................................................................................... 47
U.S.S.G. § 2B1.1 ....................................................................................................... 30
U.S.S.G. § 2B1.1(10) ................................................................................................ 30
U.S.S.G. § 3C1.1 ....................................................................................................... 34
U.S.S.G. § 6A1.3(a) .................................................................................................. 21

The Government respectfully submits this memorandum in advance of the sentencing of the defendants, Michael Castillero, Francine Lanaia, and Brian Martinsen, scheduled for April 15, 2026, and in response to the defendants' sentencing memoranda dated April 1, 2026 (Dkt. 213 "Martinsen Mem."; Dkt. 214 "Lanaia Mem."; Dkt. 215 "Castillero Mem.").

## PRELMINARY STATEMENT

The Court should sentence Castillero and Martinsen to 11 years' imprisonment and Lanaia to 10 years' imprisonment as just punishment for their years-long campaign of lies and self-dealing that left in its wake over $100 million in losses and thousands of victimized investors. The defendants used a classic boiler room sales pitch—we don't make money unless you make money—and high-pressure sales tactics to convince ordinary people all over the country to trust their retirement funds and savings to StraightPath and invest in high-risk, illiquid, opaquely priced pre-IPO securities. The defendants hid from their victims that they were siphoning 30% of the money earmarked for investments as their upfront cut, lining their pockets while overcharging their investors. Through their fraud, the defendants obtained nearly $400 million from their victims. From that $400 million, they stole $130 million to pay themselves, to pay their accomplices, and to pay for more securities to sucker in more victims. And when anyone asked questions that would have shut them down—their victims, FINRA, the SEC—they lied and destroyed evidence to keep the scheme going.

This sentencing proceeding will mark the end of the defendants' nearly ten-year effort to evade responsibility for their crimes. In 2017, the defendants erected a group of entities they controlled—StraightPath—to distance themselves from the lies they fed unsuspecting investors. They now ask the Court to view the entities they created to commit their crimes as disembodied ghouls, responsible to no one. The defendants installed Eric Lachow as the puppet fund manager to be the public face of the StraightPath operation, touting him in their offering documents,

1

parading him before regulators, and sending emails and letters in his name. They now ask the Court to believe that this did not matter, as there is no legal definition of "Fund Manager" and so there can be no misrepresentation about a role that was not required to be filled in a particular way. The defendants raised an army of unregistered sales representatives and now disavow any responsibility for those individuals' lies to investors, notwithstanding the three-week trial proved the defendants recruited them, trained them, paid them, were aware of their deceitful and disingenuous sales pitches, and then hid them from FINRA and the SEC.

All three defendants claim a previously blameless life, while asking the Court to ignore the fact that they were not supposed to be operating StraightPath because of their history of transgressions in the securities industry. FINRA sanctioned Castillero and Lanaia with permanent bars that should have ended their securities careers; Martinsen now admits that the reason he lied in his testimony to FINRA in 2019 is because he knew if he had told the truth about StraightPath's operations it would have been shut down. And, of course, had the defendants not lied and had StraightPath been shut down in 2019, most of the losses investors suffered would have never occurred.

The defendants' disdain for honesty, for following the law, and for the harm they caused their victims is apparent too in their sentencing submissions and, in Castillero and Martinsen's case, their post-conviction conduct. None of the defendants have taken responsibility for any of their actions. None have expressed contrition or remorse for any aspect the StraightPath scheme. None have admitted any harm they caused to investors or acknowledged that their deceit that caused ordinary, real people—many older and retirees—to part with their money, money they may never recover. The defendants continue to deny what the jury resolved with its verdict: Castillero, Lanaia, and Martinsen concocted a scheme to lie to investors by deliberately concealing that they

2

would make money upfront on each investor's contribution, and by lying about StraightPath's true ownership and operations.

The Court should take the defendants' continued lack of acceptance of responsibility into account in imposing a sentence that is sufficient but not greater than necessary to account for this brazen and corrupt criminal scheme. The Probation Office recommends a below-Guidelines sentence of ten years for all three defendants. The Government respectfully submits that the Court should adopt Probation's recommendation for Lanaia but impose higher 11-year sentences for Castillero and Martinsen for their deliberate deletions of subpoenaed emails during the SEC's investigation of StraightPath.

## THE OFFENSE CONDUCT

### I.  Background

As established at the trial, StraightPath was founded in late 2017 by Castillero, Lanaia, and Martinsen, together with a fourth partner who left after a few months. StraightPath purported to be a private fund that sold interests in private, or "pre-IPO," companies to accredited investors. StraightPath sold these interests primarily through boiler-room style call centers, where the defendants and their agents cold-called prospective investors and pitched them on investing in private shares using aggressive sales tactics. The defendants and their agents lied to investors and prospective investors, including about who was really running StraightPath; about the markups and fees that applied to their investments, which the defendants used to secretly line their pockets; and about whether StraightPath in fact owned the shares it was selling to investors.

StraightPath eventually grew to include nine different funds, a holding company (StraightPath Holdings, LLC), an entity that was described as the "manager" of the nine StraightPath funds (Straight Path Venture Partners), and an entity that was described as the "investment adviser" of the nine funds (StraightPath Management LLC). (*E.g.*, Tr. 456, 1428,

3

1620, 1626-27; GX 1-9, 1103). StraightPath filed multiple Forms ADV with the SEC that identified StraightPath Management LLC as an exempt reporting investment adviser under the Investment Advisers Act. (*See* GX 14, 15).

Castillero was listed on formation documents as the incorporator, director, or managing member of the various corporate entities (GX 16-2, 17-4, 25-2, 27-3), including the advisory entity, StraightPath Management LLC (GX 26-1). After he was barred from the securities industry, his interests were transferred on paper to Martinsen and Eric Lachow, the nominal fund manager. (GX 16-3, 17-1, 25-1, 26-2, 27-1). But the evidence at trial proved that Castillero, Lanaia, and Martinsen jointly controlled and ran each of these entities throughout the lifetime of the scheme, including the advisory entity. The three defendants consulted each other on all aspects of StraightPath's operations, including fund formation, soliciting investors, recruiting and compensating salespeople, sidelining Lachow, obtaining pre-IPO shares, setting markups and commissions sufficient to pay themselves and their sales agents, papering the sales, and stonewalling regulators like FINRA, the SEC, and state securities regulators.

## II. Facts Relevant to Fraud Counts

### A. Lanaia's and Castillero's FINRA Bars

While running StraightPath, both Lanaia and Castillero were barred by FINRA from acting as a broker or otherwise associating with any FINRA member in any capacity, based on disciplinary issues separate from StraightPath. (GX 501, 502). On or about January 16, 2018, Lanaia was suspended by FINRA for three months. (GX 501; Tr. 265-66). This suspension was converted into a permanent bar on or about October 29, 2018. (GX 512 at 10; Tr. 267). Castillero was barred by FINRA on or about February 6, 2019. (GX 502, 510 at 10). Neither Lanaia nor Castillero substantively altered what they were doing for StraightPath after they were barred from the securities industry. (Tr. 450). As discussed further below, Castillero's interests in the

4

StraightPath corporate entities were transferred on paper to Martinsen, but bank records showed that the defendants continued to be paid an equal share of income from StraightPath before and after this supposed transfer. (GX 1011).

B. Puppet Fund Manager and Control Over the StraightPath Entities

In approximately November 2017, around the time StraightPath launched, Martinsen approached a childhood friend, Eric Lachow, to ask him to serve as the public face of StraightPath as the nominal fund manager for the StraightPath funds. (Tr. 396-97). Lachow had previously worked as a stockbroker but had no experience with private funds or serving as a fund manager. (*Id.*; GX 511). He did, however, have a clean Broker Check record, with no history of FINRA discipline or customer complaints. (GX 511).

Initially, Lachow believed that he would be shadowing Lanaia and learning the business so that he could grow into the role of Fund Manager. (Tr. 404). However, as StraightPath grew, Castillero, Lanaia, and Martinsen sidelined Lachow. In July 2019, Martinsen texted Castillero and Lanaia that he had told Lachow that StraightPath did not need Lachow to "watch [] over" or "help" Lanaia. (GX 207-9). The decision to keep Lachow in the dark allowed Castillero, Lanaia, and Martinsen to run StraightPath as they saw fit without consulting Lachow.

Meanwhile, an email address was set up in Lachow's name (the "ELachow Email"). This email address was primarily operated by Lanaia, although Castillero and Lachow also had access to it. (Tr. 418-19; GX 204-1 through 204-7). The ELachow Email was used for investor correspondence, including sending out hyperlinks to give investors access to StraightPath documents such as the private placement memoranda (PPMs), information about the particular pre-IPO companies StraightPath recommended to its clients, and Welcome Letters confirming investors' purchase of pre-IPO shares from StraightPath. (Tr. 420; *see e.g.*, GX 1205). Although Lachow had access to the ELachow Email, he was routinely chastised by the others for "messing

5

up" the emails when he used it. (*E.g.*, GX 204-6, 221-10, 204-7, and 221-1). Lachow used a different email address to correspond with his own clients when he sold pre-IPO interests as a StraightPath sales agent. (Tr. 419).

Lachow was described in StraightPath's PPMs, sent to investors, as the Fund Manager for each of the StraightPath Funds. (*E.g.*, GX 9 at 28).[1] He was also described as the Managing Member of StraightPath Venture Partners, the Manager entity. *Id.* The Manager was described as responsible for the day-to-day operation of the Funds. *Id.* This was inaccurate, as Lachow was not responsible for the day-to-day operation of any of the Funds. (Tr. 456). Lachow was also listed as the "Manager" and "Chief Compliance Officer" of StraightPath Management in its Form ADV filings. (*See, e.g.*, GX 15).

Lanaia and Castillero were not named in any of the PPMs or operating agreements as involved with the StraightPath Funds. (GX 1-9). Initially, Martinsen was not named in any of the PPMs either. (GX 1-3). Beginning in or around March 2019, Martinsen's role was described as follows: "In February 2019 Mr. Brian Martinsen was appointed the Director of StraightPath Management, LLC, and StraightPath Venture Partners, LLC. Mr. Martinsen holds the majority membership interests in both StraightPath Management and StraightPath Venture Partners. (GX 4-9 at 28). This description was false and misleading. Martinsen was not appointed in February 2019; he was one of the founders of StraightPath dating back to 2017. (Tr. 462). In addition, Martinsen was not the sole operator of the StraightPath entities, but instead Martinsen, Lanaia, and Castillero jointly controlled all of the StraightPath entities at all times.

---

[1] PPMs for StraightPath Funds One through Nine were admitted as GX 1 through 9, and, unless otherwise noted, each contained similar if not identical language.

Castillero, Lanaia, and Martinsen chose to present Lachow as the Fund Manager, without actually empowering him to work as the Fund Manager, because Lachow had a clean Broker Check record. Investors who testified at trial testified that it would have mattered to their investment decision if they had known that the individuals truly running StraightPath had lengthy histories of customer complaints and discipline by industry regulators. (Tr. 73, 206, 351, 876, 934-35.)

C.  Lies to Investors about Markups and Fees

The defendants, and sales agents working at their direction, lied to StraightPath investors about StraightPath's markups, fees, and compensation structure. The defendants falsely represented to each investor in the StraightPath funds that StraightPath waived upfront fees and only took a percentage of the investors' profits after the pre-IPO company went public and its stock began trading. (*E.g.*, Tr. 411; GX 60). In fact, StraightPath charged investors exorbitantly high upfront fees in the form of a share price markup that vastly eclipsed fees that StraightPath paid to acquire interests in the same shares.[2]

The defendants charged investors these hidden fees notwithstanding they knew doing so was contrary to long-standing industry regulations on fees and markups. FINRA's 5% rule states that markups must be reasonable, sets forth a set of factors that broker-dealers must consider in assessing any markup, and proscribes that markups should not generally exceed 5 percent. (Tr. 255, 303, 827-29). While FINRA's guidance does not prohibit markups above 5 percent in every case, FINRA has made clear that markups above 5 percent are extremely unusual and that the circumstances justifying otherwise exorbitant markups should be rigorously documented. (Tr. 829-

---

[2] The markup represented the difference between the price StraightPath paid to purchase the shares (the cost basis) and the price at which it sold the same shares to an investor (the sale price). Tr. 1467-68; *accord* Tr. 840.

30). The SEC's enforcement of the securities laws has also established that brokers can never charge undisclosed markups that exceed 10 percent; such a markup is *per se* fraudulent. (Tr. 1161-63; GX 2001).

The undisclosed markups the defendants charged their victims blew this guidance out of the water: StraightPath's markups ranged from 13% on average for SpaceX on the low end to 86% on average on the high end for Triller (GX 1036), with individual markups in many cases more than *doubling* what StraightPath paid to acquire the shares (*E.g.*, GX 1042 – 170% markup; GX 1047 – 104% markup). These hidden charges ate into investors' potential profit. Even for those pre-IPO companies that ultimately went public and made money for StraightPath's investors, the amount of money investors made was substantially less than it should have been had StraightPath sold the shares to investors at its cost, as the defendants promised. (*See e.g.*, GX 1001; Tr. 502 (Lachow testifying that knowing StraightPath's cost basis, which was typically the market price, was "critical" because the higher "the percentage above the market price that [investors were] paying, the farther they are behind let's say the eight ball of recovering the money that they invested just to get back to zero before they can make profits")).

The upfront markups allowed Castillero, Lanaia, and Martinsen and their agents and employees to receive a guaranteed profit on each investment, while their clients had to wait for the IPO to receive any money, and even then, they received less gain than they would have otherwise. For extremely high share price markups, there was a risk that the investor would not make money at all or would lose money, because the price of the stock would have had to substantially increase for the investor to break even.

Castillero, Lanaia, and Martinsen not only omitted from their disclosures the share price markups, they affirmatively lied and said that there were no fees or markups associated with

8

StraightPath's shares. In the PPMs, the defendants falsely disclosed that markups "may" be charged, when the defendants knew that StraightPath's business model was to charge markups in every case. (GX 1-9 at 23 ("may" language); GX 223-1 at 2 (Martinsen telling Lisser that the markup needed to be higher because otherwise "we would all make nothing on it")); Tr. 461 (testifying that profit from markups went to the defendants, sales agents, referral agents, and brokers)). In addition, the Welcome Letters that the defendants sent to investors falsely stated that all upfront fees were waived and that the entirety of the investor's capital contribution went to the purchase of shares. (*E.g.*, GX 60-18EA). In fact, a substantial percentage of each investor's capital contribution went instead to cover StraightPath's operating costs, upfront commissions to the sales agents who brought in the investors, and as upfront profit to the defendants.

These lies about no upfront fees and StraightPath not being paid until the investments went public were repeated to investors over the phone, as further discussed in Section E, *infra*. Recordings of calls with StraightPath sales agents were introduced at trial, in which the jury heard those sales agents assure investors that there were no upfront fees and that StraightPath did not get paid until the investors got paid. (*See* GX 910, 911, 912, 1285-R). And the scripts that sales agents used when calling prospective clients included several modules about fees, including, "the way we conduct our business and the investment is we don't charge a single penny, not one red cent, until we have proven ourselves to your and turn you a profit," and "There are no upfront costs or commissions to get involved in this investment. The only fee associated with this purchase is 20% of *just your profits*." (GX 906 (emphasis in original)).

D. Commingling and Share Shortfalls

The defendants represented in the StraightPath offering documents that investors would invest in a particular "Series" and that all investor money would be segregated by Series such that winners are not netted against losers. (*E.g.*, GX 9 at 16). The Welcome Letters, in turn, made

reference to investment Series that made clear that each Series was a block of shares of an individual pre-IPO company. (*E.g.*, GX 60-2DM). However, contrary to these representations, the defendants commingled investor funds across not only Series but also across Funds, treating all StraightPath money as a fungible slush fund for themselves. At their direction, StraightPath's bank accounts made approximately 1600 inter-fund transfers over a four-year period. (GX 1018).

The defendants' commingling of funds negatively impacted investors because it caused investor money to be used to pay out other investors, to purchase different pre-IPO shares than the particular investor had sent money for, and to pay upfront profits to the defendants and their agents. (GX 1005, 1006, 1007, 1008, 1009, 1010, 1022; *see also* Tr. 847 (discussing risks to investors when funds are commingled)). Additionally, the defendants' failure to keep investor money appropriately segregated led to share shortfalls—across five pre-IPO issuers, StraightPath acquired fewer shares than it "sold" to its investors. (GX 1026-1030). Contemporaneous text messages confirm that the defendants were aware at times that StraightPath was sold out of inventory of particular shares but continued marketing those shares to its investors anyway. (GX 210-29, GX 202-51, 206-15).[3]

---

[3] Martinsen suggests that no commingling occurred because the offering documents allowed StraightPath to "pool" the money in each investment fund and series by upstreaming it to the SPVP operating account to purchase shares, before later reallocating it to the funds. (Martinsen Mem. 13-14). He cites no evidence for this arrangement, which contradicts the very purpose of segregation. (Tr. 846-48). (To state the obvious, there is no reason why SPVP had to use its bank account to acquire pre-IPO shares, as opposed to the individual bank accounts established for each fund.) Moreover, it is contrary to the trial evidence, including representations made to investors in the offering documents, the welcome letters, and by phone—as the investors thought they were purchasing interests in shares that StraightPath had *already acquired* at a set price, not that their money would be used to acquire the shares in the first place. That deception is what led to the harms of commingling demonstrated at trial.

E.  StraightPath Communication with Investors and Investor Testimony

Multiple investors testified about the representations that StraightPath made to them over the phone to convince them to invest. These investors in general testified that StraightPath used high-pressure sales techniques to push them to invest, that the callers advised them it was in their best interests to make these investments, and that they relied on the advice of these callers and StraightPath in making their investment decisions. For example, Rodrigo Reis testified about how the tone of the calls was "[h]igh pressure. Don't miss the opportunity. Let's go. Let's make money. And, you know, we can do this. It's easy money." (Tr. 68-69). Reis himself "didn't have any knowledge in regard to the company" StraightPath was pitching (Tr. 82), but in making his investment decision he "relied on pretty much what [the caller] had told me." (Tr. 74). As a result, "in [Reis's] mind, they were going to be like my advisors, the folks that were going to take care of my money and watch for me . . . That's what they made it sound like." (Tr. 92).

The other victim witnesses recounted similar experiences with StraightPath. Jerry Wells testified that he did not "really know too much—really anything about [the company he invested in]. I left that up to [the StraightPath caller] since he was in the business, was so much more knowledgeable than I was. You know, I have my own corporation to run, so I put my trust in him, because when I talked to him, he had a lot of knowledge of all these companies I invested in, and every one of them he said was very, very strong. He had a lot of good things to say about them." (Tr. 149). David Mapes also testified that he relied primarily on the information that StraightPath sent him to make his investment decisions, including a curated set of articles and websites (Tr. 345), because "getting private company information in the wild is not easy. It almost all resides behind pay walls, and I didn't have a budget for that." (Tr. 361). Ellen Ackerman testified about how the caller told her that the investments "were great opportunities. This is the price they were selling them for, and they were expected them to go public in the next six months to a year. And

11

they were expected to go public and he gave me numbers about what they were expected to go public for." (Tr. 871). And Edmund Denaburg explained how the caller from StraightPath gave a "hard sell" and "was just very pushy. But there was credibility." (Tr. 931).

A StraightPath sales representative who testified at trial confirmed that the representatives were trained to closely follow a script, which they referred to as "the Bible," and which included "common rebuttals to common objections that we would get on phones, anything to combat and ultimately close the client. . . . to wear down the client, so to speak." (Tr. 973-74). Some of these scripts were introduced into evidence. (*See* GX 906, 907, 909). The rebuttals in the representatives' scripts reenforced the idea that the investors should view StraightPath representatives as their advisers and place their trust in StraightPath's investment recommendations. For example, the following rebuttal modules were set out in GX 906:

- Let me ask you something, what are you going to know that you don't already know? We've done our homework, we've spent many hours and hundreds of thousands of dollars researching this company for you. Every technical and fundamental factor is in your favor. We've ripped apart the balance sheet based on earnings, assets, and cash flow. This stock is undervalued, there is nothing you're going to find out that we don't already know…

- I am your information! That's why you retain me, to read between the lines. We've already done hundreds of hours of research on this stock, because you don't have time to read 50-page reports on the fundamentals of the last few years of this company's history. You probably have 20 other things on your mind as we speak. Everything you need to know and think about we've already thought about. I've done 5 months worth of research on this company before I started putting my clients into it. All the technical and fundamentals are in your favor more than ever before.

- I need one percent of your confidence, I know I'll earn the other 99% the second this company hits the market…

- I can send you enough information to wallpaper your home but I want you to understand something…I'm in my office 12 hours a day, on the floor of the exchange twice a week, I probably get more information from the hot dog guy then [sic] most brokers do reading their research reports that aren't even worth the paper it's printed on. So let's do this!

12

- I don't understand how to fix an engine, so I go to a mechanic when my car needs fixing. I don't understand what's wrong with my body, but I go to a doctor when I'm not feeling well. I don't understand every law out there, so I use a lawyer when I need legal advice. . . . [T]he point I'm trying to make is that I leave it up to the professionals. . . [W]e are the professionals/ That's why you hire me.

- You may have to go through half a dozen, a dozen, maybe even a couple dozen guys before you find that one right banker that can consistently make you money. And I'm telling you right now, I'm that guy! . . . Let me prove my worth to you, and let this be the stepping stone to a long term and profitable relationship!

GX 906 (capitalization modified for readability).

While the defendants primarily relied on their network of unregistered individuals to sell StraightPath to unsuspecting victims, the trial evidence also proved that Castillero and Martinsen personally solicited and sold pre-IPO shares to individual investors through StraightPath, and that Lanaia communicated by email afterwards with investors through the ELachow Email. (*See, e.g.*, GX 1401, 1421).

## III.  Facts Relevant to Deception and Lies to Regulators and Obstruction Counts

### A.  SEC Examination

Near the end of 2018, the SEC's Examinations Division began conducting an examination of StraightPath and its operations.  The SEC staff conducted several in-person meetings and requested documents.  Before the first meeting, Castillero, Lanaia, and Martinsen discussed the meeting by text message, including pretending that another sales agents' desk belonged to Lachow to hide the fact that Lachow did not really do much work at StraightPath. (GX 207-4). The first meeting was attended by Lachow and Castillero. They falsely represented that Lachow was the true Fund Manager and that StraightPath had no other employees—disguising the roles of both Lanaia and Martinsen. (Tr. 1605 ("[T]hey stated that Lanaia was a consultant for StraightPath Management assisting Mr. Lachow in obtaining records for the staff's examination.")).

13

The second meeting took place in March 2019, after Castillero had been barred by FINRA. That meeting was attended by Lachow, Castillero, and Martinsen. At the second meeting Martinsen falsely represented that he had joined StraightPath only recently and that he was taking over for Castillero given the FINRA bar. When pressed by the SEC staff about the fact that his LinkedIn profile showed he was associated with StraightPath since its inception and had listed him as its Managing Director since a year prior, Martinsen continued to lie and brushed off the profile as "meaningless." (Tr. 1608-10; GX 926). Moreover, other than fake board minutes the defendants made to falsely show control had been transferred from Castillero to Martinsen (Tr. 447-50; GX 27-1; *see also* Tr. 452-55 (discussing GX 1407, showing contemporaneous creation of the "malejandro" email address for Castillero)), there were no changes to StraightPath's operations or ownership structure—Castillero, Martinsen, and Lanaia continued to split the profits of their scheme 1/3, 1/3, and 1/3. (GX 1011). Given Lachow's paper-title-only role, Lanaia stepped in to address the SEC's requests for documents and explanation, but still used the ELachow Email to keep a false layer of insulation between herself and her true role as a StraightPath principal. (Tr. 1613-16; Tr. 524-26).

In September 2019, the SEC staff completed their examination and told Martinsen and Lanaia by phone that StraightPath appeared to be in violation of multiple federal securities laws. After this call, the SEC sent the defendants two formal letters delineating the findings.[4] Among other things, the SEC informed the defendants that:

- Lanaia appeared to be acting as an officer or promoter of StraightPath notwithstanding her FINRA suspension and bar, and thus StraightPath could not rely on Rule 506(c) of Regulation D of the Securities Act to sell interests in the StraigthPath funds to investors as unregistered securities.

---

[4] GX 400, 401.

- StraightPath appeared to be violating the antifraud provisions of the Investment Advisers Act by lying to investors through the Funds' PPMs, namely, by: (i) not disclosing Castillero's ownership and control; (ii) not disclosing Lanaia's ownership and control; (iii) not disclosing Lanaia's FINRA suspension[5]; (iv) commingling investor money; (v) telling investors StraightPath had acquired shares it did not have; (vi) failing to disclose upfront fees paid to referral agents;

- StraightPath's Form ADV appeared to contain similar misstatements and omissions; and

- StraightPath appeared to be aiding and abetting its referral agents' violations of Section 15(a) of the Exchange Act by paying them transaction-based compensation for referring investors to StraightPath even though they were not registered brokers.

After receiving these letters, Castillero, Lanaia, and Martinsen did not make the corrective action the SEC had called for. They instead submitted a response letter riddled with false statements, such as that Castillero was the sole founder of StraightPath and Lanaia was merely performing "clerical duties" as a consultant to StraightPath, that StraightPath did not commingle investor money, that the PPMs disclosed all referral agent fees, and that, as of February 2019, Castillero resigned from StraightPath and transferred all of his interests to Martinsen. Even after receiving these warnings from the SEC, the defendants continued running StraightPath as before.

B. Martinsen's False FINRA Testimony

On December 10, 2019, Martinsen gave on-the-record testimony to FINRA as part of FINRA's investigation into SW Financial, a then-registered broker-dealer that sold StraightPath interests. GX 503. FINRA asked Martinsen questions about StraightPath and its operations. Martinsen lied. Among other things, Martinsen stated that Lachow was in charge of all of the day

---

[5] The PPMs the Exam team reviewed pre-dated Castillero's FINRA bar and Lanaia's conversion of a suspension to a bar.

to day operations at StraightPath, including choosing which pre-IPO companies to invest in and how to price the shares, that Castillero's role was "clerical" following his FINRA ban, and that Martinsen was not aware of what Lanaia's role at StraightPath might be, testifying that he did not interact with her in a professional capacity.

Meanwhile, Martinsen texted Castillero and Lanaia during a break in that same testimony, complaining that the deposition looked like it would go all day and that FINRA was trying to "corner" him into a "control person" for StraightPath but he is "not letting that happen," and was instead testifying that "Eric [Lachow] was and always has been control person." (GX 205-1). Martinsen also testified, falsely, that StraightPath did not charge "crazy" high spreads and that Lachow set typical markups were in the two-and-a-half percent range (GX 503 at 24), i.e., under FINRA's 5% rule, when evidence, including contemporaneous text messages, proved that Martinsen knew that StraightPath regularly charged markups of more than 30% and that Martinsen was the person setting those markups.

C. SEC Enforcement Investigation and Subpoena

After the SEC Examinations Division concluded its examination, it made a referral to the Enforcement Division for further investigation. The Enforcement Division opened an investigation and issued a subpoena to StraightPath calling for documents and communications. StraightPath slow-rolled the productions and tapped Lachow to engage with the SEC.  Lachow had several calls with SEC staff concerning the documents, and Lachow attempted to get Lanaia to focus on the document requests, but she indicated she was too busy. (GX 221-3, 221-4). In text messages, Martinsen joked that Lanaia would "wamboosle" the "SEC lady" so that she will "forget what she is looking for." (GX 207-13).

The documents and communications the SEC had subpoenaed included any and all referral agent agreements and any and all communications with referral agents. That request followed the

16

SEC's warning to Martinsen and Lanaia that StraightPath was violating the securities laws by paying unregistered referral agents transaction-based compensation. StraightPath did not provide the demanded documents. By a series of follow-up emails and letters, the SEC set deadlines for the production of this material, which the SEC had reason to believe existed based on documents it had seen and bank records showing payments to the agents.

The defendants did everything they could to avoid revealing to the SEC that, notwithstanding the Exam team's warning over a year prior, they continued to employ unlicensed referral agents and pay them transaction-based compensation. First, in response to the SEC's demand for a list of all entities and people StraightPath used to find investors and all emails with those finders, in November 2020 the defendants only identified three registered brokers: SW Financial; Cova, and Warden and produced no emails. (Tr. 1732-34; GX 410). Over the next several months, the SEC followed up with Martinsen repeatedly about his failure to comply with the subpoena (Tr. 1734-37). By March 2021, the SEC provided Martinsen with a list of all the referral agents—many of them unlicensed—that it believed StraightPath employed, including those the SEC suspected were using StraightPath-hosted email addresses. (Tr. 1736-39; GX 1342).

On May 1, 2021, in apparent response to an email sent by one of these referral agents—an email StraightPath had not provided the SEC—Castillero texted Martinsen that he was shutting down that referral agent's office. Complaining about the email, Castillero wrote "An asshole regulator would have a field day." (GX 202-46).

A few days later, on May 5, 2021, Martinsen instructed Castillero by text message to tell several referral agents not to use their StraightPath emails. Martinsen wrote: "We r going to claim that they don't have emails and we don't. Have archives" adding, "Just delete their emails." "Fuck it." (GX 202-47). Castillero then accessed StraightPath's email provider and deleted entire

17

StraightPath email accounts, with all of their contents, for eight referral agents, including those the SEC had specifically noted it was demanding in the follow-up email correspondence regarding the SEC subpoena. (GX 701; Tr. 1746-48).

Martinsen wrote the SEC a letter the same day, on May 5, 2021, stating that StraightPath did not have the emails and did not keep archives, without disclosing that the reason why StraightPath did not have them is that Castillero had just deleted the accounts at his direction. Martinsen also responded to the list the SEC had provided and, for every name listed, falsely told the SEC they had "No SPVP email address." (Tr. 1739-41; GX 411 and 414[6]).

Believing this to be a false representation, the SEC again pushed Martinsen for failing to comply with the subpoena, asked him explain whether any evidence was deleted, and disclosed that the SEC was "aware that certain individuals and entities did have email addresses with the StraightPath domain at straightpathvp.com." (Tr. 1742-43; GX 1402). Notwithstanding that the SEC had squarely called him out for his misrepresentations, Martinsen lied again, stating that "[a]lthough an [SPV] email [for referral agents] may have existed at one time, they no longer exist," without revealing that the emails no longer existed because he instructed Castillero to delete them in response to the SEC's repeated inquiries. (Tr. 1743-45; GX 412).

IV.  **Facts Relevant to Investor Losses, Forfeiture, and Restitution**

StraightPath received close to $400 million from more than 2,000 investors, every one of which was victimized by the false representations about StraightPath's fee structure, management, and operational promises. The Government proved at trial that the defendants received $399 million in investors, that is, the aggregate investor deposits in StraightPath over a four-year period.

---

[6] As discussed further *infra*, metadata shows Lanaia was the author of GX 414.

(Tr. 1442-43). While the evidence at trial—and by the defendants' own admission in their sentencing submissions—showed that StraightPath's books and records were shoddy, Prof. Venkataraman was able to calculate the $399 million investor loss amount by reviewing the StraightPath funds' bank statements, removing interfund transfers, rewires, brokerage payments, and payments made by the defendants into the accounts. (Tr. 1442).[7]

In 2022, the Securities and Exchange Commission filed a civil enforcement action against the defendants and StraightPath and obtained an order appointing a receiver (the "Receiver") to wind down StraightPath and return investor money. The StraightPath Receiver calculated a total investor amount of $394.1 million (Receiver Victim Impact Statement ("VIS") at 3), within 2% of Prof. Venkataraman's calculation. The Receiver's calculation is based on her analysis of approximately $371.5 million in initial cash investments by StraightPath investors and approximately $22.6 million in cash and shares that StraightPath investors reinvested from one pre-IPO investment to another. (*Id.* at 3 & n.6).

Of this $399 million, the defendants paid themselves approximately $76 million in cash. (Tr. 1447 ($76 million); GX 1408 at 3 ($73.9 million); Receiver VIS at 4, 10 ($83.7 million in cash and shares)). The evidence at trial showed that the defendants funneled that money to different physical assets, including real property, luxury vehicles and yachts, and precious stones and jewelry. (GX 1408). In addition to their personal gains, the defendants also used approximately

---

[7] Prof. Venkatarman explained that, in addition to this bank account calculation, he compared the bank accounts to StraightPath's general ledgers, which showed a match of investor deposits of approximately $356 million, as well as to individual welcome letters, which showed a match of approximately $329 million. (Tr. 1443).

$40.3 million of investor money to pay the "referral agents," including $35 million to L&G Capital Corp., which operated a boiler room selling StraightPath to unsuspecting victims. (GX 1033 at 2).[8]

The Receiver calculated that, out of the $394.1 million she determined StraightPath took in from investors, approximately $263.7 million was used to acquire share for investors consistent with the representations made to investors, including disclosed brokerage fees. (Receiver VIS at 8 & n.15). The difference of approximately $130.2 million is what the Receiver calculates as the actual loss to StraightPath investors because it was diverted—instead of being used to purchase shares on behalf of investors, it was paid to the defendants, to their referral agents, or used to acquire shares other than what investors thought they had purchased. (*Id.* at 9, 13-14). After the institution of the receivership, the defendants remitted approximately $15.2 million in escrow to the Receiver. *Id.* at 12.

The evidence at trial made plain, repeatedly, that StraightPath investors were fraudulently induced to invest based on the defendants' lies and, had they known the truth, would not have invested through StraightPath. *See, e.g.*, Tr. 121 (Reis); Tr. 205 (Marshall); Tr. 351 (Mapes); Tr. 872, 876 (Ackerman); Tr. 940-41 (Denaburg).

### THE DEFENDANTS' FACTUAL OBJECTIONS TO THE PSR

The factual allegations in each presentence investigation report ("PSR") are the same (the paragraph numbers do not align across the reports). Castillero raised no objections to the factual allegations in the PSR, although he joined his co-defendants' objections to the Guidelines

---

[8] The principals of L&G Capital Corp—Mario Gogliormella, Steven Lacaj, and Karim Ibrahim—have all pleaded guilty to conspiracy to commit securities fraud, wire fraud, and investment adviser fraud, and substantive investment adviser fraud, and are scheduled to be sentenced before Judge Broderick in the coming weeks. *See United States v. Gogliormella*, 24 Cr. 362 (VSB).

calculation, forfeiture and restitution. (Castillero Mem. 8, 17). Lanaia and Martinsen each raised objections to the factual allegations and to the Guidelines calculations. (Lanaia PSR at 36-37; Lanaia Mem. 6-7, 9; Martinsen PSR at 37-38). For the reasons that follow in this section and in the subsequent section discussing the Guidelines calculation, the PSR's factual recitation is accurate and supported by the trial record.

## I.  Applicable Law

Courts must resolve material factual disputes before sentencing a defendant. *See United States v. Berndt*, 127 F.3d 251, 257 (2d Cir. 1997). "[T]he Guidelines make clear that '[w]hen any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor.'" *Berndt*, 127 F.3d at 257 (quoting U.S.S.G. § 6A1.3(a)). But courts also have wide discretion in how to resolve such disputes, which do not require evidentiary hearings with live testimony. *United States v. Ghailani*, 733 F.3d 29, 54 (2d Cir. 2013). Indeed, the sentencing court "is entitled to rely on any type of information known to it," in resolving sentencing disputes. *United States v. Tracy*, 12 F.3d 1186, 1203 (2d Cir. 1993) (citing *United States v. Carmona*, 873 F.2d 569, 574 (2d Cir. 1989)). A district court may find facts relevant to sentencing by a preponderance of the evidence. *See United States v. Vaughn*, 430 F.3d 518, 527 (2d Cir. 2005); *United States v. Garcia*, 413 F. 3d 201, 220 n.15 (2d Cir. 2005); *United States v. Crosby*, 397 F.3d 103, 112 (2d Cir. 2005).

## II.  Discussion

### A.  Lanaia Objections

Lanaia objects to paragraphs 11, 38, 48, 55, and 117 of the PSR because, she claims, these paragraphs unfairly "lump[] her together" with her co-defendants when her "role primarily was administrative." (Lanaia Mem. 6). These paragraphs are discussed in further detail below, but broadly, Lanaia's assertion that her role was "administrative" is incorrect and misstates the record.

21

The evidence at trial established that Lanaia was a co-founder, co-owner, and co-equal partner of StraightPath, along with Castillero and Martinsen.

Paragraph 11. No changes are required to Paragraph 11 of the PSR, which states that "StraightPath sold these interests primarily through boiler-room style call centers, where CASTILLERO, LANAIA, MARTINSEN and their agents cold-called prospective investors and pitched investing in private shares using aggressive sales tactics." The PSR does not state that Lanaia personally went to boiler-room style call centers or cold-called prospective investors. But to the extent Lanaia is arguing that she lacked knowledge of the boiler-room tactics that StraightPath was using, this assertion was contradicted by the trial evidence. For example, Lachow testified that he forwarded Lanaia a recording of a StraightPath caller using boiler-room tactics to aggressively pitch an investment to a prospective client. (Tr. 473-476; GX 1285, GX 1285-R). And while Lanaia often worked remotely, she also worked on occasion in-person at StraightPath's physical offices on Wall Street, which was one of the locations where referral agents cold-called prospective investors. (GX 222-3).

In addition, Lanaia had extensive experience supervising sales representatives and was familiar with their techniques. As she said to Castillero in a November 2019 text message, "I've literally recruited hired and trained over 2000 sales and marketing reps in securities, mortgages, merchant processing and other businesses." (GX 222-9).

Paragraph 38. No changes are warranted to the sentence "CASTILLERO, LANAIA, MARTINSEN and sales agents working at their direction deceived StraightPath investors about StraightPath's markups, fees, and compensation structure." As discussed above with respect to Paragraph 11, the trial evidence showed that Lanaia was aware of the activities of the sales agents at the StraightPath boiler-rooms. In addition, the record showed multiple text messages between

22

Lanaia and the operators of those boiler-rooms in which she provided them direction about how to conduct business. (*See, e.g.*, GX 203-9 (Lanaia stating "I resent the Airbnb breakdown to Anthony which is self explanatory the referral can go over it with each customer that is their job"); GX 210-27 (Martinsen asking Lanaia to "please send peter [at Sentinel] an email with our current offerings"); GX 211-15 (text message chain about paying commissions to boiler-room); GX 222-8 (text message from referral agent Scott Hollender to Lanaia saying "Hey Fran, I wanted to apologize to you if u felt like I was coming down on you about [an investor's] shares. I was just talking to you as an officer of the company."); GX 222-14 through GX 222-20 and GX 222-22 through GX 222-23 (extensive text messages between Lanaia and Mario Gogliormella, head of StraightPath's biggest boiler room)).

Paragraph 48. No changes are required to Paragraph 48, which states that "In addition to overseeing the boiler rooms by writing contracts governing StraightPath's relationship to referral agents and paying the referral agents based on the money they brought into StraightPath, CASTILLERO, LANAIA, and MARTINSEN oversaw and monitored the referral agents in other ways." With respect to evidence of Lanaia's involvement with the boiler-rooms, see responses to Paragraphs 11 and 38, above.

Paragraph 55. No changes are required to Paragraph 55. The paragraph correctly states that the SEC informed StraightPath that it was concerned that Lanaia was acting as an "officer" or "promoter" despite her FINRA bar. The SEC did in fact raise that concern. Ms. Lanaia's argument that she was not, in fact, an officer is contradicted by the extensive trial evidence showing her involvement in the management of the company and her receiving one-third of the company's profits. It also includes a text message from a referral agent to Lanaia in which that agent stated that he was "talking to you as an officer of the company." (GX 222-8).

23

Paragraph 117. No changes are required to Paragraph 117, which states that "the defendant was a founder of StraightPath Venture Partners (StraightPath)." When Lachow was asked "Who founded StraightPath," he answered, "Brian, Fran, Mike, and Jason Mediate." (Tr. 462). In addition, Lisser testified that Lanaia was one of the co-owners of StraightPath and that she "helped set up the fund." (Tr. 1248).

Lanaia further objects to paragraphs 15, 32, 45, 51, and 52 of the PSR as misstating StraightPath's written materials. (Lanaia Mem. 6). No changes are warranted to these paragraphs.

Paragraph 15. No changes are required to Paragraph 15. The paragraph does not state that Lanaia personally wrote each of StraightPath's organizational documents, but that she was "primarily responsible" for writing those documents. The trial record establishes that this characterization is accurate. For example, Mark Lisser testified that Martinsen and Castillero told him that Lanaia "was a third owner with them" and that Lanaia's role at StraightPath was "[t]hat she helped set up the fund, the high-level paperwork to get the slots and the fund paperwork all set up. It was complicated. She was on top of helping with that and any type of major operations they needed help with for new funds that they kept adding on." (Tr. 1248). Furthermore, in text messages from October 2017, Castillero asked Martinsen to "please make sure w Fran that all docs are done," and Martinsen said, "She replied back on the group that she did it." (GX 202-15).

Paragraph 32. No changes are required to Paragraph 32's statement that the PPMs describe the role of Individual-1 (Eric Lachow) as being responsible for the day-to-day operation of the funds. The PPMs state that "[t]he Manager will be responsible for the day-to-day operations of the Fund," and then identify Eric Lachow as the sole member of the Manager. (GX 1 at 15).

Paragraph 45. No changes are required to Paragraph 45. With respect to the evidence of Lanaia's involvement in drafting of fund documents, see responses to Paragraph 15, above.

24

Paragraph 51. No changes are required to Paragraph 51. The PSR does not conflate fees and markups. The evidence at trial showed that StraightPath had a consistent practice of marking up the price of its shares and using that markup to pay fees to the defendants and their sales agents.

Paragraph 52. No changes are required to Paragraph 52. The trial record contains extensive evidence that StraightPath did not segregate investors' funds by series but instead commingled investor money not only across series but also across funds. (*See, e.g.*, GX 1006 (tracing how investor money was commingled across funds to purchase Scopely shares); GX 1007 (tracing how investor money was used to pay other investors); GX 1008 (tracing how Fund 9 investor money was used to pay Fund 7 investors); Tr. 1200 (Professor Laby testifying, "I've never seen a situation where commingling is proper.")).

Finally, Lanaia objects to the facts (and Guidelines enhancement) concerning obstructing and impeding the administration of justice and deceiving the SEC in paragraphs 69 and 75. Lanaia Mem. 6-7.

Paragraph 69. No changes are required to Paragraph 69. The paragraph correctly states that Lanaia "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice when LANAIA deceived the SEC concerning Individual-1's role at StraightPath during the SEC's investigation." For example, Lanaia, Martinsen, and Castillero texted about making the fund manager's desk look like it belonged to Eric Lachow when the SEC examiner visited. (*See* GX 207-4). The trial record also showed that in general Lanaia attempted to obscure StraightPath's operations from the SEC examiners. (*See, e.g.*, GX 207-13 ("Fran is going to wamboosle the sec lady tomorrow. They will talk weather for 45 min and the lady will forget what she's looking for.")). These lies were part of a pattern of the defendants—including Lanaia—lying to regulators about Lanaia and Lachow's respective roles in the company. For example, Martinsen gave false

25

testimony to FINRA in which he claimed that Lanaia was an outside consultant who had no role in the day-to-day management of the fund, which was instead carried out by Lachow. During a break in the testimony, Martinsen texted Lanaia to update her that FINRA was "trying to corner me into a control person" but that he was "not letting that happen" and that he told FINRA that "Eric was and always has been control person." (GX 205-1).

B.  Martinsen Objections

Martinsen objected to the factual representations in paragraphs 14, 35-37, 41-45, 48-50, 52-56 of the PSR, which the Probation Office resolved without changes based on the trial evidence. Martinsen PSR 38. Although Martinsen's submission does not address these objections, the Government assumes that he has not withdrawn any of his objections and that they require resolution.

Paragraph 14. This is the same as Lanaia's paragraph 11, and no changes are warranted to the PSR for similar reasons. The record is replete with evidence that Martinsen supervised and had knowledge of StraightPath's boiler-rooms. In addition to what is already summarized above, Lachow advised Martinsen that he was planning to start looking for sales reps "in the gutters." (GX 221-13).

Paragraphs 35-37. These paragraphs correspond to Lanaia's paragraphs 32-34. No changes are warranted to paragraphs 35 and 36 for the same reasons addressed in Lanaia paragraph 32 above. No changes are warranted to paragraph 37, which accurately states that information transmitted to investors "was inaccurate as MARTINSEN was not appointed in February 2019 as he was one of the founders of StraightPath and MARTINSEN, LANAIA, and CASTILLERO jointly controlled all of the StraightPath entities at all times." (*See* Tr. 462 (Lachow testimony that "Brian, Fran, Mike, and Jason Mediate" founded StraightPath)).

26

Paragraphs 41-45. Martinsen objects to the PSR's discussion of markups and fees, asserting similar arguments to those he advanced at trial during cross examination and in argument to the jury that markups are distinct from fees and so the representation StraightPath made that upfront fees were waived was neither untrue nor misleading. (*See also* Martinsen Mem. 17). The extensive trial evidence concerning StraightPath's markups and fee structure, and its lies to investors concerning the same, is summarized in Part II.C, *supra*, and establishes that Martinsen's objections to these paragraphs should be overruled.

Martinsen also encloses as Exhibit F to his submission a draft chart, which was not offered at trial or subject to cross-examination as to its accuracy or how it was created, that purports to compare the share prices StraightPath investors actually paid to what they would have paid if StraightPath had charged a 10% markup, plus all the fees set forth in the offering documents that were in fact waived. There is no relevance to this chart, which is likely why Martinsen did not offer it at trial—the hypothetical terms under which StraightPath might have, but did not, offer securities is not relevant to the defendants' misrepresentations about price, including the hidden share price markups.

Paragraphs 48-50. Martinsen raises objections to the paragraphs concerning StraightPath's boiler-room tactics. No changes are warranted to these paragraphs for the same reasons discussed in the responses to Lanaia's objections to similar paragraphs concerning StraightPath's operations of boiler-rooms.

Paragraphs 52-53. Martinsen disputes the trial proof that he had awareness of the recorded phone call or that he told Individual-1 (Lachow) that he would not want to hear how Gogliormella and Lacaj sounded on the phone. Lachow testified credibly on this issue, and there is no basis to modify these paragraphs of the PSR. (*See* Tr. 472).

27

Paragraph 54. Martinsen asserts that it was truthful that StraightPath did not charge upfront fees. For the reasons already discussed, this representation was false and misleading, as reflected in the communications themselves. While the defendants primarily relied on their network of unregistered individuals to sell StraightPath to unsuspecting victims, the trial evidence also proved that Castillero and Martinsen personally solicited and sold pre-IPO shares to individual investors through StraightPath, and that Lanaia communicated by email afterwards with investors through the ELachow Email. (*See, e.g.*, GX 60, 1401, 1421).

Paragraphs 55-56. No changes are warranted to these paragraphs concerning StraightPath's commingling for the same reasons discussed above in response to Lanaia's objections to her paragraph 52.

## THE GUIDELINES CALCULATION

The Sentencing Guidelines promote the "basic aim" of "ensuring similar sentences for those who have committed similar crimes in similar ways," *United States v. Booker*, 543 U.S. 220, 252 (2005), and so "to secure nationwide consistency, the [Sentencing] Guidelines should be the starting point and the initial benchmark," *Gall v. United States*, 552 U.S. 38, 49 (2007). The Probation Department calculated, for each defendant, that all of the counts of conviction should treated as one group, and, for that group a base offense level of 7, a 28-level enhancement based on a loss amount of more than $250 million but less than $550 million, a 2-level enhancement for the number of victims, a 2-level enhancement for sophisticated means, a 4-level enhancement for acting as an investment adviser or associating with an investment adviser, a 4-level enhancement for organizer or leader of a criminal activity that involved five or more participants, and a 2-level enhancement for obstruction of justice.

Probation calculated each defendant thus having an adjusted offense level of 49, above the maximum total offense level of 43, and, with a Criminal History Category of I, a resulting

28

Guidelines range of life imprisonment. Because that Guidelines range is above the statutory maximum for each defendant, however, the Guidelines sentence here is the statutory maximum of 75 years' imprisonment for Castillero and Martinsen (Castillero PSR ¶ 142; Martinsen PSR ¶ 142), and 50 years' imprisonment for Lanaia (Lanaia PSR ¶ 134).

The defendants raise various objections to Probation's Guidelines calculation.[9] With one exception that does not affect the statutory maximum Guidelines sentence, none of the objections have merit.

A. Loss Amount

Martinsen objects to Probation's calculation of the loss amount as the full amount invested of $399 million, contending that the loss amount for Guidelines purposes must be calculated as net of the value of the securities the defendants sold their investors under the Second Circuit's decision in *United States v. Leonard*, 529 F.3d 83, 93 (2d Cir. 2008). (Martinsen Mem. 20-22). Martinsen is correct that, under *Leonard*, the court must deduct from the investors' purchase price the "actual value of the instruments." Here, based on the evidence, that is at least the $130 million in investor funds diverted by the defendants to themselves, the referral agents, the surplus shares that the defendants did not sell to investors. *Supra* at 20. Accordingly, rather than a 28-level enhancement, the Probation Department should have applied a 24-level enhancement for more than $65 million in loss but less than $150 million in loss. *Leonard*, 529 F.3d at 93 ("The reasonable valuation of . . . illiquid assets is an exercise best committed to the sound discretion of the district court.").

Martinsen's further objection that this amount should be reduced by the 10% in commissions he *could* have charged before tripping the SEC's rule against *per se* fraudulent

---

[9] Castillero joins in each of his co-defendants' arguments without separately restating his objections. (Castillero Mem. 8).

markups not only has no basis in *Leonard*, it is also specious because it assumes every StraightPath investor would have been willing to pay 10% more than Martinsen paid for the same securities and that even a 10% markup would be appropriate under the FINRA 5% rule. *Cf. United States v. Stitsky*, 536 F. App'x 98, 112 (2d Cir. 2013) ("The Guidelines do not require a loss to be offset by any legitimate expenditures."). This adjustment to the loss calculation, however, makes no difference to the Guidelines range, as the adjusted offense level of 45, rather than 49, still exceeds the maximum total offense level of 43.[10]

B. Sophisticated Means

Martinsen also objects to the application of the sophisticated-means enhancement under U.S.S.G. § 2B1.1(10). (Martinsen Mem. 21-22). Probation found the enhancement warranted because "the defendants and their agents used multiple boiler room call centers in multiple jurisdictions and used multiple LLC entities with fraudulent operating agreements and board minutes to facilitate the offense. In addition, [Lachow] was used as the public face of StraightPath to conceal the defendants' involvement due to their history of FINRA discipline and customer complaints." (Martinsen PSR at 38). That is both correct and consistent with Application Note 9 to Guidelines Section 2B1.1, provides examples of sophisticated means as, "in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means.  Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means."

---

[10] Indeed, even taking *just* the $76 million defendants personally obtained as a result of the scheme, the 24-level enhancement would be appropriate. *Cf.* U.S.S.G. § 2B1.1 n.(B) ("The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined.").

Here, the defendants used hidden referral agents running boiler rooms in multiple locations and states to entice unsuspecting victims they cold-called into investing in StraightPath, which represented itself as a legitimate financial institution located on Wall Street—in a rented temporary office space—on "25 Broadway, not far from the bull." (Tr. 1239). The referral agents all pretended to work as StraightPath employees—thus giving the appearance of a larger, more credulous and established organization. For example, Schuyler Minton testified that he believed he worked for "StraightPath" but reported to the owners of the L&G boiler room—Gogliormella, Lacaj, and Ibrahim—who provided StraightPath-branded attire to their employees. (Tr. 966-972 and GX 801-33). The defendants hid their involvement in StraightPath by listing Lachow as the "Fund Manager" while disguising themselves as consultants (Martinsen), regulatory contacts (Lanaia), or co-operators with Lachow (Castillero), or, in Castillero's case, removing himself post-FINRA bar, all the while concealing their 1/3-1/3-1/3 co-equal ownership of StraightPath.

The defendants worked together to find hard-to-source pre-IPO securities and then turned around and set hidden markups that were sufficient to motivate their referral agents to sell the securities to more victims at inflated prices. The defendants created multiple LLCs to avoid violating the Investment Company Act's limitation on more than 100 investors in a fund, and then treated those corporate formalities as hogwash, commingling funds as necessary to keep the scheme going and creating fraudulent board minutes to hide the defendants' control of StraightPath. The scheme lasted for years, defrauded thousands of victims, and raised nearly half a billion dollars. And when regulators attempted to discover the fraud, whether FINRA through on-the-record testimony, SEC Examinations, or SEC Enforcement, the defendants worked together to "wamboosle" financial regulators and keep their scheme going.

31

This was, by any measure, a sophisticated enterprise. *Accord, e.g.*, *Stitsky*, 536 F. App'x at 112 (affirming application of sophisticated-means enhancement to securities fraud scheme that (1) "lasted several years"; (2) "reflected very careful planning"; (3) included a "careful effort to conceal the fraud" (4) "relied on creating and disseminating marketing publications that contained material misrepresentations"; (5) involved "fictitious corporate officer" and "call scripts containing material misrepresentations"; and (6) followed "Guidelines' example" of operations out of multiple offices). As the Second Circuit has repeatedly explained, "even if each step in the scheme was not elaborate," the total scheme may be "sophisticated in the way all the steps were linked together," including efforts taken to conceal the offense. *United States v. Jackson*, 346 F.3d 22, 25 (2d Cir. 2003).

Moreover, again, even if Martinsen were correct about his objection to this enhancement, the total offense level would still be the maximum of 43 and the applicable Guidelines range would remain unchanged.

C. <u>Obstruction of Justice - Lanaia</u>

Lanaia objects to the obstruction of justice enhancement. As discussed above in the response to her objection to Paragraph 69 of the PSR, Lanaia's attempts to hide information from regulators alone justify the obstruction enhancement. In addition, although Lanaia was not charged with the specific scheme to obstruct the SEC investigation after StraightPath received the SEC's subpoena for documents and information, the trial record established that Lanaia did in fact knowingly participated in that specific scheme as well.

At trial, the evidence showed that the defendants falsely stated in their May 5, 2021 response letter to the SEC that they did not have referral agreements with a number of referral agents with whom StraightPath did, in fact, have referral agreements. (GX 414). Many of these individual referral agents were the agents whose emails were deleted after StraightPath received

the subpoena. The metadata for the word document with the false statements shows Lanaia as the author of the document, supporting the inference that Lanaia drafted the May 5, 2021 response letter for Martinsen to sign and send to the SEC in order to obstruct the SEC's investigation.

Similarly, as discussed *supra*, after receiving Martinsen's May 5, 2021 letter, the SEC asked Martinsen to explain what happened to the StraightPath email accounts for referral agents like Scott Hollender and whether any evidence had been destroyed. On May 21, 2021, Martinsen submitted another false letter to the SEC, where he stated that the accounts at "one time" existed but "no longer" did, without admitting he directed Castillero to delete the emails. (GX 412) The trial evidence shows Lanaia helped draft this response as well. (GX 212-11 (Lanaia texting Martinsen and Castillero on May 21, 2021: "Brian. I just sent you the written response to the SEC. please review.")).

In addition, text messages between Lanaia, Martinsen, and Castillero show that Lanaia was deeply involved in providing documents and information to the SEC in response to the SEC's requests. (*See, e.g.*, GX 212-4 (Lanaia texting Castillero that "the sec just confirmed the only thing needed are the emails"); GX 212-5 (Lanaia texting Martinsen about what information they should and should not provide to the SEC); GX 212-7 (Lanaia texting Martinsen that "The SEC wants a phone call" with Lachow and discussing how to handle the request)). Lanaia, Martinsen, and Castillero also texted about the fact that their referral agents—the agents whose emails and identities StraightPath withheld from the SEC—had received subpoenas from the SEC. (*See, e.g.*, GX 212-12 (Martinsen reporting to Lanaia that a referral agent received a subpoena, with Lanaia telling him to "send a copy" to her personal email address; they then discuss whether they can prevent the agent from responding); GX 212-14 (Martinsen texting to report another referral agent

had received a subpoena)). Lanaia correctly identified to her co-conspirators the issue that the SEC was investigating: "Compensation. That is what this is all about." (GX 212-12).

Lania, Martinsen, and Castillero all worked together to obstruct the SEC's investigation, including into whether StraightPath was violating the securities laws by aiding and abetting the payment of transaction-based compensation to unregistered referral agents, an issue that SEC Examiner Steven Debella had personally already warned Lanaia was an area where StraightPath was potentially violating Section 15(a) of the Exchange Act. (*See* GX 401 at 1-2; Tr. 1639-40, 1653-54; *see also* Tr. 1563-65 (summarizing evidence of Lanaia's awareness that StraightPath was paying unregistered referral agents transaction-based compensation, including, GX 211-3, 211-4, 211-7)).[11] And, while Lanaia suggests that she did not engage in obstruction of justice because Debella "did not testify that [Lanaia] deceived him" and said she was helpful to him (Lanaia Mem. 6-7), Lanaia omits that Debella was not aware of the facts developed showing how she obstructed him, such as the defendants' text messages. (Tr. 1699).

These facts are more than sufficient to find by a preponderance that the obstruction enhancement applies because Lanaia "conceal[ed] evidence that is material to an official investigation." U.S.S.G. § 3C1.1 cmt. 4(d); *see, e.g.*, *United States v. Fiore*, 381 F.3d 89, 94-95 (2d Cir. 2004) (perjury during SEC civil investigation warrants obstruction enhancement); *United*

---

[11] Indeed, Martinsen hides the ball when he contends that it was entirely proper for StraightPath to use unregistered referral agents and that doing so was "not designed to defraud the investing public," while stating that, "it is perhaps worth noting that there are, in fact, various exemptions to the registration requirement for finders and marketers which are based upon the manner in which compensation is earned." (Martinsen Mem. 13). That was the point—the SEC warned the defendants that it was illegal to assist their referral agents in violating the securities laws by accepting transaction-based compensation, and, knowing that their very business model was set up that way, Martinsen, Lanaia, and Castillero did nothing to fix this illegal act and deleted emails that would prove their culpability rather than produce them to the SEC in response to an SEC subpoena.

*States v. Ware*, 577 F.3d 442, 454 (2d Cir. 2009) (filing false affidavit in SEC civil investigation warrants obstruction enhancement). Moreover, even if Lanaia were correct and the obstruction-of-justice enhancement did not apply to her, her Guidelines range would remain unchanged (assuming the Court correctly rejects the defendants' objection to the sophisticated means enhancement).

### D. Obstruction of Justice - Martinsen

Martinsen also objects to the obstruction enhancement on the ground that, because he was convicted of the substantive offense of obstruction of justice, the Guidelines enhancement under Section 3C1.1 is inapplicable, citing Application Note 7. (Martinsen Mem. 22-23). Martinsen is wrong. As Application Note 8 makes clear, because Martinsen and Castillero's obstruction convictions were grouped with the underlying fraud convictions—a grouping to which Martinsen raises no objection—the two-level obstruction enhancement applies. (Martinsen PSR ¶ 81).

## A SIGNIFICANT SENTENCE OF IMPRISONMENT IS NECESSARY

Significant sentences are necessary for each of the defendants to achieve the ends of justice, including accounting for the seriousness of the offense, promoting respect for the law, and satisfying the objectives of general and specific deterrence.

Along with the Guidelines, the other factors set forth in Title 18, United States Code, Section 3553(a) must be considered. Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two. That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and

> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

Section 3553(a) further directs the Court to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a).

Throughout the following section, the Section 3553(a) factors apply to each defendant individually, but the defendants here are remarkably similarly situated and for that reason, many of the factors apply similarly to them. In total, the Probation Department's recommendation of a below-Guidelines sentence of ten years' imprisonment is, for Lanaia, the minimum sentence that will appropriately vitiate the interests set forth in the Section 3553(a) factors. For Castillero and Martinsen, given the brazenness of their deletion of emails in response to an SEC subpoena, an additional one year in prison, for a total of eleven years' imprisonment, will satisfy the Section 3553(a) factors.

## I. The Nature, Circumstances, and Seriousness of the Offense Warrant a Significant Sentence

A significant incarceratory sentence is necessary in light of the nature and circumstances of the offense and the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. *See* 18 U.S.C. § 3553(a)(1) & 3553(a)(2)(A).. In the pursuit of wealth at all costs, the defendants broke every imaginable FINRA rule, SEC regulation, and federal securities laws. They duped thousands of investors into parting with nearly $400 million and secretly diverted over $100 million to

36

themselves and their co-conspirators. They kept the scheme going for years, finding new victims, many of them older victims who were cold-called and lacked sophistication in the financial markets. Those victims gave the defendants their hard-earned money, whether generated through years of work, inheritances from family, or otherwise, in the hopes of making a return on what the defendants' and their army of boiler room salesmen pushed on them as safe, guaranteed investments, backed by the assurance that if the victims did not make money, StraightPath would not make money.

These victims are the heart of this case. To be sure, every victim is different and each has their own unique circumstances. But, by and large, they were not "sophisticated" investors who were seeking "100% speculation" and had "high risk tolerances" (Castillero Mem. 6), who were properly advised of the risks by StraightPath and its agents (Martinsen Mem. 4-5)). The victims were not hedge fund portfolio managers or billionaires investing for their family offices—they were small-business owners, CPAs, retired factory workers, grandparents, computer engineers—everyday folks who were deceived by StraightPath's high-pressure sales tactics. While some of them made money on some of the investments, they did not make as much as they should have had the defendants followed through on their promises, and many are waiting for any returns on their investments, if ever.

The Court saw firsthand the falsity of the defendants' victim-blaming when it heard the live testimony from some of the victims. Consider David Mapes, whom the Government would place on the more sophisticated end of the investor spectrum—even he testified that he was an IT specialist who retired 25 years ago and works as a "part-time mechanic." (Tr. 342). He did not testify—pursuant to the Government's instruction to avoid a Rule 403 issue—that he is also the sole caretaker for his adult daughter, who suffers from a medical disability that has left her

37

essentially nonverbal, and that he was unsure he would be able to testify at trial because he needed to find care for his daughter to travel from Maryland to New York to do so.

Even setting aside the victims who testified, the Court did not hear from countless other victims, many of whom had their own life circumstances that the defendants elide by suggesting their classic boiler-room operation was nothing more than making new, attractive, high-risk investments available to wealthier persons with the risk appetites to handle them. For example, the Government interviewed other victims who it elected not to call as trial witnesses, including a poultry farm owner who suffered from Parkinson's that affected his ability to speak, and a 76-year-old North Dakota farmer who invested over $300,000 but was concerned that he would miss harvest days if he testified in New York in the fall.

The victim impact statements submitted to the Court are illustrative of the harms the defendants' caused their investors. Jack Marshall, the retired Chrysler maintenance manager from Michigan who testified at trial that he invested $40,000 with StraightPath, writes that he "was 86 years old at the time I purchased the supposed shares of Kraken and Triller. After finding out Straightpath was fraudulent, the situation has greatly [a]ffected me and my family emotionally and financially. I thought this was legit. . . . Now I've lost a lot of money and will never get it back."

Edmond Denaburg, the CPA who invested hundreds of thousands with StraightPath, spoke to the monetary and dignitary harms of being a victim of fraud:

> Being told I was buying a stock for the same price that Straightpath was paying and then finding out the actual cost was about 50% of that price is just fraud. Net of what little recoveries there have been, my family lost over $200,000 which for us is a lot of money . . . . I see people do a lot of bad things with what I do for a living. While I read and hear about fraud like this, I never thought it would happen to me. At the end of the day, I am disappointed in myself for not vetting Straightpath harder. I am disappointed that there are people who so easily lie to you over the phone about an investment just so they can steal your money. People are supposed to grow up being

38

taught right from wrong. . . . They didn't steal from the rich, they stole from everyday people.

Another victim writes that, even after investing over $100,000 with StraightPath, he was saving $90,000 in cash to pay income taxes, but that "my straight Path Broker, Tom Palaio, pressed me very hard and finally convinced me that Triller would come out before I had to pay the taxes and therefore I should go ahead with the purchase [of $90,000 in Triller]. As you know, [Triller] did not [go public], and I had to borrow money to pay these taxes, a loan that is still outstanding today." Another, a 32-year-old Frito Lay factory worker, writes that he was trying to save for retirement while supporting five children, and that the $50,000 he lost "through the scamming, lying frauds perpetrated at Straightpath" was the equivalent of one year of his hard hard, hourly physical labor and "countless hours of anxiety." Another, still-working grandparents raising three children and three grandchildren, writes that high-pressure cold calling convinced them to invest nearly $350,000 in StraightPath, of which they have recovered only a small portion:

> Your Honor, we together knew the risk involved with this investment, but we thought our money would be handled in a professional and safe manner. We knew it could all be lost but lost due to market situations and NOT due to greedy predators who put their financial interest above all others. This was our chance to take what little money we had saved after decades of work and money from a small inheritance after my parents' passing, to financially secure our retirement and have enough to provide for our grandchildren. We entrusted everything to them.
>
> Our retirement and the future of our grandchildren relied on StraightPath. We believed this was the right financial move for our family. Now with our money being used for the pleasure and financial benefit of these criminals, our life is uncertain. Retirement is outside the question. We cannot afford to. Our stress levels are high, which has led to arguing and detriments to our physical health. We are totally disgusted by these people who preyed on us in a vulnerable position and took away what we worked so hard to achieve.

39

The defendants' lies enabled them to take money from these victims to enrich themselves and their criminal confederates to the tune of tens of millions of dollars. These lies were brazen. They were repeated. They covered everything from who ran StraightPath, to whether the victims could trust StraightPath because their interests were aligned, to whether they had the shares they were selling the victims, what they were actually buying, whether they were quoting them a fair price, and how risky the investments were.

While the defendants try to distance themselves from the lies told by the boiler-room call operators (*E.g.*, Lanaia Mem. 6; Martinsen Mem. 15-17), there is no doubt that the trial evidence showed they knew exactly what they were doing. That was clear when Castillero, using the ELachow Email lied, plain as day, in an email to an investor and claimed that StraightPath Venture Partners does not charge any upfront fees" and charges only a "20% backend on any profits when there is an IPO." (GX 1404; Tr. 1263-65). It was clear when Lisser testified how he received call scripts from Castillero, with the instructions "[n]ot to mention any front fees whatsoever, and just a profit share should the stock work out" (Tr. 1273-74), and how Martinsen personally pitched one of Lisser's investors on investing in StraightPath while lying about its fee structure. (Tr. 1280-87; GX 1420, 1421, 60-23ML). It was clear when Lachow forwarded Lanaia and Martinsen a recording of a StraightPath sales agent lying to an investor (GX 1285; 1285-T; 221-14; Tr. 473-492).

Martinsen, Lanaia, and Castillero had decades of experience in the securities industry and all had their own brush-ins with securities regulators. This evidence—and common sense—demonstrates that the lies, whether in the PPMs, the welcome letters, or on the caller-to-caller pitches—were all part of the defendants' fraudulent playbook, the same playbook that has been

around for those same decades, as shown in movies like Boiler Room (2000) and The Wolf of Wall Street (2013).

Not only did the defendants perpetrate a brazen fraud, when regulators tried to discover their conduct, they doubled down on their lies to cover up their crimes and keep the scheme going. Martinsen lied to FINRA during his testimony about every material topic. He pretended not to know what the markups StraightPath were charging was, stating Lachow was setting markups under the industry norm of 5%, while setting exorbitant markups in text messages with Lanaia and Castillero. He lied about who was running StraightPath, shifting the blame to Lachow, pretending not to know Lanaia, while texting her and Castillero about his lies *at the breaks in this FINRA testimony*. Martinsen suggests that his efforts to hide his involvement in StraightPath were all about hiding from his former employer and not about putting Lachow up as a "clean" name for StraightPath (Martinsen Mem. 3, 9-11). That is contradicted by this trial evidence—by his lies to FINRA, his lies to the SEC, and the text messages showing that the defendants knew they needed to hide their disciplinary histories from investors or investors would get spooked. (*See, e.g.*, GX 223-5; Tr. 1276-78).

When the defendants' regulatory troubles mounted and they faced an SEC examination, they proceeded to scheme to lie again, as discussed *supra*. The defendants' contention that they should get credit for responding to a "voluntary" request to SPVP for its bank records is meritless (Castillero Mem. 7; Martinsen Mem. 12). The examination of StraightPath Management was not voluntary—StraightPath was required to keep books and records and produce them to the SEC (Tr. 1627-28). This justification fails just like the defendants' argument that because they *partially* produced documents in response to an SEC Enforcement subpoena, their obstruction by deleting

41

emails specifically and repeatedly requested by the SEC should be seen as less egregious (Martinsen Mem. 13).

It was not. The Court saw the jury's shocked reaction when, after marching through the correspondence between SEC attorney Tian Wen and Martinsen where Wen repeatedly requested StraightPath referral agent emails, the jury finally saw Martinsen's text instruction to Castillero, "[W]e are going to claim [to the SEC] that [the agents] don't have emails and we don't have archives. Just delete their emails. Fuck it." (GX 202-47). The brazenness of the defendants' view that the rules did not apply to them cannot be overstated. Indeed, Martinsen persists in his absurd contention that all he instructed Castillero to do was to deactivate the email *addresses* and not delete those accounts' *content*. (Martinsen Mem. 12).[12]

The defendants' efforts to minimize their conduct and suggest they merely made mistakes building a runaway successful company that got away from them (Castillero Mem. 7; Martinsen Mem. 6-7), that they were merely acting in back-office "administrative" functions that somehow justified over $25 million in compensation (Lanaia Mem. 6), or, perhaps most egregiously, that, in fact, notwithstanding the jury's verdict, victim and expert testimony, and common sense,

---

[12] Martinsen's contention that the GoDaddy representative, Danielle Baker, testified that the user would be "not be alerted" that the email content is deleted and that she was "uncertain" whether the content would remain is contradicted by Baker's actual testimony that Castillero deleted both the email addresses and their content. (Tr. 1708-10). This contention, as well as Martinsen's suggestion that StraightPath later produced large amounts of documents to the SEC showed no intent to obstruct (Martinsen Mem. 13), is especially rich considering that, outside the context of the trial testimony, Martinsen knows that the referral agent StraightPath emails the SEC subpoenaed, such as Scott Hollender's, were never produced by StraightPath to the SEC *because Martinsen directed Castillero to delete them while he lied to the SEC.*

StraightPath's fees were transparently disclosed to investors (Martinsen Mem. 4-6, 17-19), should all be rejected.[13]

For these reasons, a significant incarceratory sentence is required. Courts in this District routinely impose serious prison sentences for investment frauds involving conduct even less serious than the defendants' conduct where there was, for example, no obstruction of justice. *See, e.g.*, *United States v. Booth*, No. 21 Cr. 652 (JSR) (sentencing defendant to 10 years in prison for boiler-room scheme that inflicted less than $3.5 million in loss on approximately 18 victims with Guidelines range of 188 to 235 months); *United States v. Galanis*, No. 15 Cr. 643 (PKC) (defendant sentenced to 10 years in prison for defrauding investors in connection with tribal bond issuance, resulting in $60 million in worthless bonds); *United States v. Alexandre*, No. 22 Cr. 326 (JPC) (defendant sentenced to 9 years in prison for defrauding investors in his cryptocurrency trading platform into investing $248 million, and misappropriating approximately $14 million); *United States v. Del Valle*, No. 14 Cr. 342 (RMB) (defendant sentenced to 98 months for defrauding investors out of millions of dollars in connection with real estate development project, misappropriating funds, and committing identity theft); *United States v. Meli*, No. 17 Cr. 127 (KMW) (defendant sentenced to 78 months in prison in connection with Broadway ticket resale investment scheme defrauding investors of approximately $100 million, where defendant used portion of money on personal expenses); *United States v. Walsh*, No. 09 Cr. 722 (LAP) (defendant sentenced to 20 years in prison for multi-billion dollar investment fraud scheme); *United States v.*

---

[13] Martinsen, in particular, repeats his frivolous argument that there was no "prevailing market rate" by which to benchmark markups on pre-IPO securities (Martinsen Mem. 18), when, as Profs. Laby (Tr. 1191) and Venkataraman (Tr. 1514), the FINRA guidance (GX 2001), *and the Court* (Tr. 1908) all made clear, StraightPath's cost basis, i.e., what it paid for the shares it overcharged investors for, is an appropriate benchmark.

43

*Vilar*, No. 05 Cr. 621 (RJS) (defendant sentenced to 9 years in prison for multi-million dollar investment fraud scheme); *United States v. Zemlyansky*, No. 21 Cr. 171 (JPO) (defendant sentenced to 15 years in prison for racketeering fraud including $17 million investment fraud scheme); *United States v. Chartier*, No. 17 Cr. 372 (JS) (E.D.N.Y.) (defendant sentenced to 10 years in prison for role in $6 million boiler room pump-and-dump scheme); *United States v. Hardy*, No. 17 Cr. 382 (E.D.N.Y.) (defendant sentenced to 10 years in prison for role in $147 million boiler room pump-and-dump scheme).

While the defendants argue that the loss calculation—the primary driver of the Guidelines range here—substantially overstates the harm (*e.g.*, Castillero Mem. 9-11), this is not a case where the loss amount is something closer to an abstraction away from the offense conduct, like the stock drop measuring the public company accounting fraud the defendant in *Adelson* joined midway through the scheme. *United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008). Indeed, as even the author of *Adelson*, Judge Rakoff, noted in sentencing boiler-room operator Robert Leonard Booth to ten years in prison, there, even setting aside Judge Rakoff's view of the loss guidelines as "inherently irrational," Judge Rakoff found a ten-year sentence warranted due to "the great and heart-wrenching evils that he brought about through the scheme that he and others perpetrated," as well as the need for general deterrence. Sentencing Tr. 2, 24-25, *Booth*, No. 21 Cr. 652.

To be sure, the defendants point to mitigating circumstances—a lack of prior criminal history, age, and family obligations—that they argue warrant in favor of leniency. The Government agrees, but only to a point. While the circumstances of the offense do not warrant the life in prison sentence called for by the Guidelines, the Government believes the seriousness of the

44

defendants' conduct calls for sentences of at least 10 years for Lanaia, and 11 years for Castillero and Martinsen.

## II.  General Deterrence Requires a Significant Sentence

General deterrence is also an important factor for the Court's consideration in this case. The Second Circuit and courts in this district have noted the appropriateness of significant sentences in the context of financial crimes committed by defendants who make the calculation that white collar crime is "a game worth playing." *United States v. Goffer*, 721 F.3d 113, 132 (2d Cir. 2013) (quoting district court and affirming sentence of 66 months' imprisonment for insider trading offense where defendant made approximately $11.5 million). And, as the Eleventh Circuit has noted, in passing the Sentencing Reform Act, "Congress was especially concerned that prior to the Sentencing Guidelines, [m]ajor white collar criminals often [were] sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006); *see also id.* ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.").

This is the first sentencing in recent years for a pre-IPO investment fraud scheme. There are other defendants awaiting pending sentencing now, many of whom pleaded guilty only after the jury returned the guilty verdict in this trial. *See, e.g.*, *United States v. Gogliormella et al.*, 24 Cr. 362 (VSB) (Legend Capital Partners); *United States v. Cangialosi et al.*, 24 Cr. 363 (CBA) (E.D.N.Y.) (Max Infinity Venture Partners); *United States v. Pirrello et al.*, 23 Cr. 499 (KAM) (E.D.N.Y.) (Late Stage Management). The Court's sentence here will set the tone for both these cases and to other market participants as to what penalties they should expect when they defraud innocent victims through sophisticated tactics. Moreover, these cases are not easy to investigate

45

and prosecute. Sentencing Tr. 25, *Booth*, No. 21 Cr. 652. It took FINRA, two independent divisions of the SEC, a court-appointed Receiver, and this Office years to hold the defendants accountable for their actions and attempt to bring justice and recompense to their victims—efforts that were complicated by the defendants dogged efforts to obstruct any effort to stop their scheme in its tracks.

As discussed *supra* and further in connection with specific deterrence, the defendants here claim that their willful and wanton fraud scheme amounted to nothing more than technical foot faults, mistakes, misinterpretations of evidence, and an honest, good-faith effort to democratize pre-IPO securities trading for sophisticated investors. The Court should reject that specious argument and send a message to other would-be fraudsters: well-worn boiler room tactics that defraud real victims, even in "new" markets, will be investigated, caught, and punished severely.

## III.   Specific Deterrence Requires a Serious Sentence

Finally, specific deterrence too here requires a substantial sentence. No consequence thus far—not FINRA discipline, not FINRA testimony, not an SEC examination, not an SEC enforcement investigation, not a criminal charge nor the unanimous guilty verdict of twelve citizens, has deterred the defendants in any way into thinking their conduct warrants substantial remeasurement or remorse. As described *supra*, the defendants continue to twist the established facts from the trial record beyond recognition, demonstrating that they have learned no lessons from their conduct beyond continuing to shift blame to others—their victims, their co-conspirators, their regulators.

Since the return of the jury's verdict, Castillero, in particular, has gone on a press tour claiming he is the true victim of a "weaponized" prosecution that targeted him for his political beliefs. This is, as goes without saying, false. Moreover, Castillero has falsely claimed in interviews that he was threatened with denaturalization, that he spent $5 to $7 million on his

46

defense despite having appointed counsel, that there were no victims to his crimes, that he was targeted by this Office and by Judge Kaplan and this Court after the SEC lost its civil case.[14] Martinsen joined him for at least one of these interviews.

Castillero's public insistence that he is being railroaded is particularly incongruous with his proffer statements, made just over one year ago, in which he acknowledged his knowing complicity in the core aspects of the fraud and obstruction. This dramatic about-face reflects Castillero's continued refusal to honestly reflect on his conduct and should be taken into account in imposing sentence.

### THE COURT SHOULD ALSO IMPOSE FORFEITURE AND RESTITUTION

In addition to a prison sentence sufficient to satisfy the Section 3553(a) factors, the Court should also order the defendants to forfeit the proceeds of their criminal enterprise and make restitution to the victims of their scheme. For forfeiture, the Government seeks a money judgment in the amount of $399 million against all three defendants, joint and several, attributable to the entirety of the proceeds that the defendants obtained through their scheme; and judgment against the specific property listed in the Government's forthcoming proposed preliminary order of forfeiture, which are traceable to the proceeds of the defendant's scheme. For restitution, consistent

---

[14] The Case For America, RealAmericasVoice, https://rumble.com/v72or6u-the-case-for-america.html (Dec. 6, 2025); Biden-Era Lawfare? – Michael Castillero Claims He Was Targeted, The Truth with John Gordon, https://www.youtube.com/watch?v=-SkU76jaJv4 (Dec. 18, 2025); Cowboy Logic – 11/29/25: Michael Castillero, https://rumble.com/v72ad8s-cowboy-logic-112925-michael-castillero.html; Targeted by Agencies. Claims, Convictions, and Clemency: An Evidence-Based Review, Ann Vandersteel, https://www.youtube.com/watch?v=am1UeeoOnho&list=FLlFZ5mTVgJijAHdxAC-gtgA&index=2 (Dec. 19, 2025); *see also* https://michaelcastillero.com/ ("First they came for the protesters. Now they are coming for the entrepreneurs. This is the January 6 Business Edition. - Michael Castillero").

with the calculations of the Receiver, the Government seeks $115 million in restitution, payable to the Receiver for pro rata distribution to StraightPath investors.

## I. Forfeiture Money Judgment

As the Court is aware, "[c]riminal forfeiture statutes empower the Government to confiscate property derived from or used to facilitate criminal activity. Such statutes serve important governmental interests such as separating a criminal from his ill-gotten gains, returning property, in full, to those wrongfully deprived or defrauded of it, and lessen[ing] the economic power of criminal enterprises." *Honeycutt v. United States*, 581 U.S. 443, 447 (2017) (citation and internal quotation marks omitted). Forfeiture is mandatory in cases involving fraud. *United States v. Torres*, 703 F.3d 194, 204 (2d Cir. 2012); 28 U.S.C. § 2461(c) ("If the defendant is convicted of the offense giving rise to the forfeiture, the court shall order the forfeiture of the property as part of the sentence in the criminal case.").

Where forfeiture is sought in the form of a personal money judgment, the district court "must determine the amount of money that the defendant will be ordered to pay." Fed. R. Crim. P. 32.2(b)(1)(A). The court's determination "may be based on evidence already in the record," Fed. R. Crim. P. 32.2(b)(1)(B), including evidence from trial. *United States v. Capoccia*, 503 F.3d 103, 109 (2d Cir. 2007). The "calculation of forfeiture amounts is not an exact science. '[T]he court need not establish the loss with precision but rather need only make a reasonable estimate of the loss, given the available information.'" *United States v. Treacy*, 639 F.3d 32, 48 (2d Cir. 2011) (quoting *United States v. Uddin*, 551 F.3d 176, 180 (2d Cir. 2009)). A court "may make reasonable extrapolations from the evidence established by a preponderance of the evidence at the sentencing proceeding." *Treacy*, 639 F.3d at 48. As "an aspect of sentencing," *Libretti v. United States*, 516 U.S. 29, 49 (1995), forfeiture amounts are determined by a preponderance of the evidence, *Capoccia*, 503 F.3d at 116.

48

The purpose of forfeiture is "punitive rather than restitutive." *United States v. Roberts*, 660 F.3d 149, 166 (2d Cir. 2011). Absent Eighth Amendment concerns, the defendant's ability to pay a money judgment is irrelevant. *United States v. Awad*, 598 F.3d 76, 78-79 (2d Cir. 2010); *United States v. Viloski*, 814 F.3d 104, 114-15 (2d Cir. 2016) (upholding forfeiture money judgment exceeding $1 billion as consistent with defendant's future ability to "earn[] a living upon his release from prison."); *United States v. Bonventre*, 646 F. App'x 73, 92 (2d Cir. 2016) (upholding forfeiture money judgment exceeding $19 billion in Madoff Ponzi scheme).

The Government seeks forfeiture here under 18 U.S.C. § 981(a)(1)(C), which sets forth that any property "which constitutes or is derived from proceeds traceable" to wire fraud or securities fraud, among other offenses, is forfeitable. 18 U.S.C. § 981(a)(1)(C); *see also* 18 U.S.C. §§ 1956(c)(7), 1961(1); *see also* 28 U.S.C. § 2461(c) (allowing forfeiture for any crime "for which the civil or criminal forfeiture of property is authorized"). Whether the proceeds subject to forfeiture include all property obtained from the offense or whether the proceeds subject to forfeiture are limited to the net gain or profit depends on whether the conduct involves "illegal goods, illegal services, [and] unlawful activities." *See* 18 U.S.C. § 981(a)(2). "[E]mbezzlement, soliciting funds as part of a Ponzi scheme," among other types of conduct, are "inherently unlawful." *United States v. Milton*, 21 Cr. 478 (ER), 2024 WL 779210, at *3 (S.D.N.Y. Feb. 26, 2024) (citations omitted). For such "inherently unlawful" acts, the term "proceeds" is defined as "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense." 18 U.S.C. § 981(a)(2)(A). In other words, "[p]roceeds" are "property that a person would not have but for the criminal offense." *United States v. Daugerdas*,

49

No. 09 Cr. 581 (WHP), 2012 WL 5835203, at *2 (S.D.N.Y. Nov. 7, 2012) (quoting *United States v. Grant*, No. 05 Cr. 1192 (NRB), 2008 WL 4376365, at *2 n.1 (S.D.N.Y. Sept. 25, 2008)).

In this case, the proper measure of forfeiture is the entirety of the gross proceeds the defendants obtained from their victims: $399 million. While the defendants each assert that any forfeiture judgment should be limited to their individual net proceeds under Section 981(a)(2)(B), i.e., how much they personally profited from the scheme, they are wrong. (Castillero Mem. 14; Lanaia Mem. 14; Martinsen Mem. 24). As the trial record showed, and as is further set forth in the Receiver's Victim Impact Statement, the defendants embezzled millions of dollars of investor funds, and induced investors to part with money based on false statements about the fees that would be charged, the alignment of StraightPath with their investors' interests, and the management of the funds. That is "inherently unlawful" conduct and therefore the gross proceeds rule under Section 981(a)(2)(A) applies. *See United States v. Bodouva*, 853 F.3d 76, 80 (2d Cir. 2017) (Section 981(a)(2)(A) applies to embezzlement); *Milton*, 2024 WL 779210, at *5 (selling securities for which prices have been inflated by "misleading statements" is "more analogous to cases involving Ponzi schemes" and thus Section 981(a)(2)(A) applies).

The defendants also contend that the forfeiture judgment should be offset by repayments to victims accomplished through the Receiver in the SEC civil action, such as the $15 million in payments to the Receiver in escrow that the defendants made, (Lanaia Mem. 14; Martinsen Mem. at 24), and the $3.5 million remittance the defendants made to cover a share shortfall identified by the SEC (Martinsen Mem. 24). But there too, they are wrong. To the contrary, the law is clear: "there is no statutory authorization for an offset" even for payments made directly to victims. *Bodouva*, 853 F.3d at 80.

50

Finally, even, if the defendants were right that the net proceeds rule under Section 981(a)(2)(B) applied, the proper measure of net proceeds is not merely each individual liability for each defendant's personal profits, but rather, joint and several liability for the totality of the funds the defendants, through their joint control of StraightPath, diverted from acquiring pre-IPO shares on behalf of the victims to payments to themselves, the referral agents, and share shortfalls. *See United States v. Tanner*, 942 F.3d 60, 67-68 (2d Cir. 2019) ("[W]hen each co-conspirator acquired the full proceeds as a result of the crime, each can still be held liable to forfeit the value of those tainted proceeds, even if those proceeds are no longer in his possession because they have been dissipated or otherwise disposed of by any act or omission of the defendant." (quoting *Honeycutt*, 137 S. Ct. at 1634-35)).

The trial evidence established that the defendants jointly controlled StraightPath and used that joint control to steal money from their victims. Through their unlawful scheme, the defendants diverted money they told their victims would be invested in pre-IPO shares to pay themselves, pay their referral agents, and buy shares other than what investors were looking for. As calculated by the Receiver, that amount is at least $130.2 million (*supra* at 20), a conservative estimate given that the Receiver's total amount invested is approximately $5 million less than what the Government proved at trial. That diverted money was in the defendants' joint control, as the trial evidence proved they controlled StraightPath equally, paying themselves a third each of the profits. (GX 1011). Accordingly, this is an appropriate fallback measure of forfeiture that considers the defendants' net proceeds of the crime, independent of the shares they actually purchased as promised to their investors.

## II.  Forfeiture of Specific Property

In addition to a personal money judgment, the Government can also seek forfeiture of specific property. The Court "must determine whether the government has established the requisite

nexus between the property and the offense." Fed. R. Crim. P. 32.2(b)(1)(A). The applicable law to determine if the requisite nexus is shown is the same as the underlying forfeiture law: here, 18 U.S.C. § 981(a)(1)(C). *See, e.g.*, *Capoccia*, 503 F.3d at 115. Once again, to determine whether specific property is forfeitable, the court may consider "evidence already in the record," or "any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable." If forfeiture of specific property is contested, the court must conduct a hearing. Fed. R. Crim. P. 32.2(b)(1)(A).

Before sentencing, the Government will submit a proposed preliminary order of forfeiture that lists specific property—real estate, luxury vehicles and yachts, and jewelry and precious stones—that each of the defendants purchased using StraightPath funds they diverted to themselves. If the defendants contest the forfeiture of the specific property, the Government will further prove, as the trial evidence showed, that the funds the defendants received can be traced to the acquisition each of the specific properties listed in the forthcoming preliminary order of forfeiture. (GX 1048).

## III.  Restitution

Under the MVRA, the Court must order restitution to the defendants' victims. *See* 18 U.S.C. § 3663A(c)(1)(A)(ii). The MVRA provides that a sentencing court "shall order . . . that the defendant make restitution to the victim" of certain types of Title 18 offenses, including any offense against property committed by fraud or deceit. 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii). A "victim" under this statute is a "person directly and proximately harmed as a result of the commission of an offense." 18 U.S.C. § 3663A(a)(2). The restitution amount is to be determined by a preponderance of the evidence, and the Court has "broad discretion to determine restitution," and need only make a "reasonable estimate" of the actual loss "based on the evidence before it." *United States v. Milstein*, 481 F.3d 132, 137 (2d Cir. 2007).

52

Here, the Receiver's submission sets forth the reasonable estimate for restitution: $130.2 million, minus credit for the $15.2 million in payments the defendants have already made to the Receivership, for a total of $115 million.[15] That amount reflects a reasonable estimate of the actual out-of-pocket losses StraightPath investors suffered, because it is the amount that the defendants and their co-conspirators stole from victims rather than investing it on their behalf, as they had promised.

The defendants' objection that restitution should be reduced by the amount distributed by the Receiver based on pre-IPO shares going public is meritless, because those are the very gains for which the defendants have already been credited in the restitution judgment through the reduction in the judgment of the actual shares they acquired. (Lanaia Mem. 13; Martinsen Mem. 23). To the contrary, as the Receiver's submission explains: "Even had each and every StraightPath investment garnered substantial gains, the Investors would still be shortchanged, of both the amount diverted that should have been invested for them, and the gains on the shares that never

---

[15] For the reasons set forth by the Receiver, the restitution judgment should not be reduced by Martinsen's remittance of approximately $3.5 million to purchase Rubrik shares, as that remittance was already included by the Receiver in its calculation of the money the defendants used to actually acquire shares for StraightPath investors; further credit would amount to double-counting. (Receiver VIS at 8, 13). In addition, the restitution judgment should not be reduced by the approximately $12.7 million in claimed "refunds" made to StraightPath investors for investments in pre-IPO companies where the defendants were unable to acquire the promised shares, such as UiPath (Castillero Mem. 14 (citing Martinsen Ex. B)), as the Receiver's calculation of the shortfall already accounts for the cash refunds made to investors for shares that were not purchased. (Receiver VIS at 3 n.7, 16). Similarly, the judgment should not be reduced by the approximately $11.9 million the defendants spent to obtain shares for which they found no buyer and the companies have not yet gone public, i.e., what the Receiver calls the "Remaining Surplus Shares," as those do not represent interests in which the investors authorized their money be spent. (Receiver VIS at 14-15). If, however, the Receiver sells the Remaining Surplus Shares for gains that will be distributed to the defendants' victims through the Receivership, the defendants would be entitled to a future credit in the restitution amount insofar as those payments reduce the victims' out-of-pocket losses.

53

were acquired for them. [This] diversion created a 'hole' that cannot be 'filled' by Pre-IPO Companies 'going public' or distributions from the Receivership. Restitution is needed to remediate this loss." (Receiver VIS at 12).

The Government agrees that the Receiver is best positioned to apportion losses to the more than 2,000 StraightPath victims based on the work the Receiver has already done in the civil case. Accordingly, the Government agrees that the restitution should be made payable to the Receiver, to be held in escrow for the benefit of StraightPath investors, and will submit a proposed restitution order to that effect.

### CONCLUSION

The defendants caused devastating financial and emotional harm on thousands of victims in connection with their role operating StraightPath through calculated deception and exploitation. The Government respectfully submits that the Court should impose a substantial term of imprisonment, in an amount of 11 years for Castillero and Martinsen and 10 years for Lanaia, to reflect the seriousness of the offense, promote respect for the law, and afford effective deterrence.

Dated: New York, New York
April 8, 2026

Respectfully submitted,

JAY CLAYTON
United States Attorney

By:

Adam S. Hobson
Allison Nichols
Matthew R. Shahabian
Assistant United States Attorneys
Tel.: 212-637-2484 / 2366 / 1046

54