UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————— X

UNITED STATES OF AMERICA,                        :

           Plaintiff,                        :

   -v-                        :          23-CR-622-JMF

                                        :

MICHAEL A. CASTILLERO, et al.                        :

           Defendants.                        :

——————————————————————— X

## RECEIVER'S VICTIM IMPACT STATEMENT

By order dated June 14, 2022 (the "**Receivership Order**") entered by the Court in *SEC v. StraightPath Venture Partners LLC, et al.,* No. 22-civ-3897-LAK (S.D.N.Y.) (the "**Civil Action**"), I was appointed receiver ("**Receiver**") for StraightPath Venture Partners LLC ("**SPVP**"), StraightPath Management LLC ("**SPM**") and their affiliates (collectively, "**StraightPath**" or the "**Receivership Entities**"), including nine investment vehicles (the "**SP Funds**")[1] that were formed by or on behalf of Michael A. Castillero, Brian K. Martinsen and Francine A. Lanaia (the "**Criminal Defendants**") to receive Investor capital.[2]

---

[1] The SP Funds include SP Ventures Fund LLC, SP Ventures Fund 2 LLC, SP Ventures Fund 3 LLC, SP Ventures Fund 4 LLC, SP Ventures Fund 5 LLC, SP Ventures Fund 6 LLC, SP Ventures Fund 7 LLC, SP Ventures Fund 8 LLC and SP Ventures Fund 9 LLC.

[2] The Criminal Defendants were highly experienced securities professionals when they engaged in the crimes for which they were convicted. Each had been the subject of customer complaints alleging fraud and/or recommendations of unsuitable investments, exactly the hallmarks of the conduct underlying their convictions. Indeed, both Mr. Castillero and Ms. Lanaia were barred by the Financial Industry Regulatory Authority ("**FINRA**") from associating with any FINRA licensed broker, such as Mr. Martinsen, yet all three Criminal Defendants continued to work together in the management of StraightPath.

1

More than 2,000 persons and entities invested in StraightPath through the SP Funds (the "**Investors**"). They are victims of the Criminal Defendants' misconduct.[3] They placed their confidence in an enterprise that was represented to be a professionally managed investment platform offering access to Pre-IPO Shares, and which only made money if the Investors made money.[4]  As the jury's verdict establishes, that was materially false and fraudulent.  And the Investors suffered as a result.

The adverse effects of the Criminal Defendants' crimes are not abstract or hypothetical. The harm they inflicted is a reality.  Millions in funds were siphoned off by the Criminal Defendants and diverted to themselves and to the sales agents they deployed as part of their scheme (the "**Sales Agents**"), resulting in significant Investor losses.[5]  As reflected by the jury's verdict, many vulnerable Investors, including the elderly, were deceived through boiler room tactics to invest their life savings and retirement funds in highly speculative Pre-IPO Shares which they could not afford.  Today, years after the Criminal Defendants' misconduct was ended in 2022 by intercession of the Securities and Exchange Commission (the "**SEC**"), Investors remain dependent on a Court-supervised receivership, an extraordinary remedy that is necessary not because markets

---

[3]  Unquestionably, the Receivership Entities are also the victims of the Criminal Defendants' conduct and hold claims under civil law against them.  However, forfeiture is a criminal punishment, *U.S. v. Elias,* 154 F.4th 56, 63 (2d Cir. 2025), as is restitution under the Mandatory Victim Restitution Act ("**MVRA**"), 18 U.S.C. § 3663A, *et seq. Ellingburg v. U.S.,* 607 U.S. ---- (2026), 146 S.Ct. 564, 2026 WL 135982, at *1 (Jan 20, 2026) ("When viewed as a whole, then, the MVRA makes abundantly clear that restitution is criminal punishment.").  Nothing in this Victim Impact Statement is intended in any way to limit or waive any claims or defenses under civil law held by any of the Receivership Entities, or by the Receiver on their behalf, against any person or entity, including the Criminal Defendants.

[4]  In this Victim Impact Statement, I refer to StraightPath "acquiring Pre-IPO Shares" for convenience only. In fact, StraightPath often did not acquire Pre-IPO Shares but invested in other companies that held Pre-IPO Shares ("**SPVs**") or entered into contractual arrangements regarding Pre-IPO Shares (e.g., forward contracts or economic interest agreements).

[5]  Sales Agents are excluded from the defined term "Investors".

2

failed, but, as the jury verdict established, because the Criminal Defendants subverted the basic duties of honesty and good faith.

Accordingly, as the StraightPath Receiver, I request that the "Judgment in the Criminal Case" to be issued as part of each Defendant's sentencing (each a "**Criminal Judgment**") identify the StraightPath Investors as victims of the Criminal Defendants' conduct and order forfeiture and restitution in the highest amount permitted under law.

**Forfeiture**:    In light of the crimes for which Criminal Defendants were convicted, including securities fraud, the amount to be forfeited (the "**Forfeiture Amount**") should be the total amount Investors invested in StraightPath, in the approximate amount of $394.1 million (the "**Total Amount Invested**").[6] All such assets were under the collective control of the Criminal Defendants and were obtained by them as part of the crimes for which they were convicted. The Total Amount Invested should be the amount to be forfeited by the Criminal Defendants.[7]

If the Total Amount Invested is not adopted as the Forfeiture Amount, then at a minimum and in the alternative, the Forfeiture Amount should be not less than $130.2 million (the "**Diverted Asset Amount**"), representing Investor capital contributions that the Criminal Defendants diverted for their own use.   Of this amount approximately $112.0 million is comprised of the hidden overcharges (the "**Mark-Ups**") taken by the Criminal Defendants on their purchase of Pre-IPO

---

[6] The Total Amount Invested is comprised of initial cash investments by Investors of approximately $371.5 million and approximately $22.6 million in cash and shares from so-called "Flips", that is, reinvestments of Investor distributions.

[7] The "Total Amount Invested" is the amount of Investor capital contributions net of any cash refunds that StraightPath made to Investors, such as the refunds that StraightPath made to Investors that had invested in StraightPath for the acquisition of shares of UiPath, Inc. ("**UiPath**").

8829367.1

Shares acquired for Investors ("**Investor Shares**") and approximately $18.2 million is comprised of Investor funds that were contributed to StraightPath by Investors to be used to acquire Investor Shares, but which the Criminal Defendants did not use for that purpose, creating a "**Share Shortfall**".

The Diverted Asset Amount created an embedded deficiency – a "hole" – in the Investors' holdings.  Even assuming that every StraightPath investment had "gone public" and that every Investor had received a significant profit on the investment, Investors would still have suffered a permanent loss of the Diverted Asset Amount – cash that was not used to acquire Pre-IPO Shares for Investors as promised, but was diverted and used to enrich the Criminal Defendants and their Sales Agents.

If, however, the Forfeiture Amount is determined to only be the amount from the criminal conspiracy that was deposited into each Criminal Defendant's personal accounts (the "**Individually Received Amounts**"), then the Forfeiture Amount for each should be the amount in cash and shares he or she personally received from StraightPath, as follows: (i) Brian K. Martinsen: $28,637,908, (ii) Michael A. Castillero: $27,575,661 and (iii) Francine A. Lanaia: $27,551,322. *See* discussion at Section II A., *infra*, at 9-10.

I recognize that the Court weighs multiple factors in determining the correct amount of forfeiture, and accordingly, to assist the Court, set forth below in summary form are the three alternatives discussed above:

4

8829367.1

Forfeiture Amount: Alternatives

| Total Amount Invested (in total, for all 3 Criminal Defendants)[8] | $394.1 million | | |
|---|---|---|---|
| Diverted Asset Amount (in total, for all 3 Criminal Defendants)[9] | $130.2 million | | |
| Individually Received Amounts (each Criminal Defendant, separately) | Brian K. Martinsen: | | $28,637,908 |
| | Michael A. Castillero: | | $27,575,661 |
| | Francine A. Lanaia: | | $27,551,322 |

**Restitution**: To remediate the losses incurred by the Investors, I request that the amount to be restituted (the "**Restitution Amount**") be in the highest amount permitted by law and that the Criminal Judgments provide that the Criminal Defendants restitution liability be "joint and several". As described more fully below, I believe that the Restitution Amount should be equal to the Diverted Asset Amount of $130.2 million or if the Court determines that certain deductions to that amount should be made, then depending on the Court's rulings, between $115.0 million and $99.6 million. *See* discussion at Sections III A. and III B., *infra* at 11-15.

I further request that the Restitution Amount be remitted to me, as Receiver, not as Receivership property but to be held in a separate escrow account under my control for the benefit of the Investors.[10] In the Receivership, I have already made *pro rata* distributions of more than $51.2 million of Receivership property to over 1,790 eligible Investors on a "net investment basis" (*i.e.*, for each Investor, reflecting all amounts invested in StraightPath and all amounts received on account of those investments). I am prepared to act similarly with respect to the Restitution

---

[8] Forfeiture from each Criminal Defendant until the full Forfeiture Amount is recovered.

[9] Forfeiture from each Criminal Defendant until the full Forfeiture Amount is recovered.

[10] Remittance of the Restitution Amount directly to me on behalf of the SP Funds could potentially have tax consequences that could reduce the amount available for distribution to Investors.

8829367.1

Amount. I believe that the efficiencies to be realized by this proposal will benefit the victims of the Criminal Defendants' conduct.

## I.    My Appointment, the Plan and StraightPath's Books and Records

On May 13, 2022, the SEC commenced the Civil Action by filing its complaint against the Criminal Defendants and others.[11]  On June 14, 2022 (the "**Receivership Date**"), the Civil Action Court entered the Receivership Order appointing me as Receiver.  Among other things, the Receivership Order grants me, as Receiver:

> all powers, authorities, rights and privileges heretofore possessed by the officers, directors, managers and general and limited partners of the Receivership Entities under applicable state and federal law, by the governing charters, by-laws, articles and/or agreements in addition to all powers and authority of a receiver at equity, and all powers conferred upon a receiver by the provisions of 28 U.S.C. §§ 754, 959 and 1692, and Fed. R. Civ. P. 66, except to the extent noted otherwise below ....

Civil Action Docket No. 56 at 4.

By Memorandum and Order dated November 26, 2024 (the "**Plan Approval Order**"), the Civil Action Court granted my motion for approval of my plan of distribution (the "**Plan**") [Civil Action Docket No. 408]. Under the Plan [Civil Action Docket No. 368-1], as Receiver, I am authorized under certain circumstances to sell public and Pre-IPO Shares held by StraightPath as of the Receivership Date. Since entry of the Plan Approval Order, as noted above, I have distributed more than $51.2 million to over 1,790 Investors, *pro rata*, based on the "net investment method" described above.[12]

---

[11] Also named as defendants in the Civil Action are SPVP, SPM and Eric Lachow.

[12] In addition, in accordance with the Plan, I have distributed approximately $221,880 to creditors ("Claimants" under the Plan) that were eligible for distributions.

6

As Receiver, I did not inherit a functioning set of books and records from StraightPath. Rather, StraightPath's financial records were incomplete, inaccurate and unreliable and among numerous other deficiencies, did not set forth how Investor funds had been handled. Although StraightPath's operating agreements required GAAP-compliant books and records, StraightPath failed to maintain even basic accounting standards: various StraightPath entities shared combined accounting ledgers; transactions were frequently misclassified or recorded without explanation; the purpose of cash and share transfers were undocumented; payments to the Criminal Defendants and to the Sales Agents were made in lump sums without schedules or other documents explaining how those payments were calculated or derived. These deficiencies were further exacerbated by extensive commingling of Investor funds across the StraightPath entities.

As a result, the accounting professionals I retained in the Receivership (the "**Receivership Accountants**") were required to reconstruct StraightPath's financial history using bank statements, brokerage records, internal spreadsheets and Investor submissions. Even with that effort, tracing Investor funds was difficult, and in many instances impossible, due to the commingling and the absence of reliable records.[13]

## II.    The Forfeiture Amount

The indictment in this case seeks forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461 of "… all property, real and personal, that constitutes or is derived from the proceeds traceable to the commission of [the offenses listed in the indictment] that the defendants personally obtained, including but not limited to [the] sum of money of at least $386 million." [14]

---

[13]    The financial data set forth in this Victim Impact Statement is based on the work of the Receivership Accountants.

[14]    The Receivership Accountants calculate the Total Amount Invested to be $394.1 million.

7

The Supreme Court in *Honeycutt v. U.S.*, 581 U.S. 443 (2017) and the Second Circuit in *U.S. v. Elias*, 154 F.4th 56 (2d Cir. 2025) have held that forfeiture only applies to "property tainted by the offense and *actually acquired* by the defendant." *Elias,* 154 F.4th at 59 (italics in original) citing *Honeycutt*, 581 U.S. at 454.

## A. <u>Each Criminal Defendant "Actually Acquired" the Total Amount Invested</u>

StraightPath was the joint enterprise of all three Criminal Defendants who collectively controlled its operations. The primary source of StraightPath's revenue were Investor contributions to the SP Funds while the fulcrum of the Criminal Defendants' criminal enterprise was SPVP, the entity through which they primarily acted. As structured, Investors were sold membership interests in one or more SP Funds, paying the Total Amount Invested of approximately $394.1 million, which was used howsoever the Criminal Defendants wanted, whether to make payments to themselves, to the Sales Agents or to purchase Pre-IPO Shares.[15]  As such, the Total Amount Invested should be deemed to be property tainted by the offense that was "actually acquired" by each of the Criminal Defendants, as control persons, and each Criminal Defendant should be subject to forfeiture until the Total Amount Invested is recovered. *U.S. v. Young,* 108 F.4th 1307,1326-28 (11th Cir. 2024); *U.S. v. Tanner*, 942 F.3d 60, 67-68 (2d Cir. 2019); *U.S. v. Gioeli*, 2019 WL 6173421, at *3-4 (E.D.N.Y. Nov. 20, 2019).

---

[15] As noted, Investors invested approximately $371.5 million through initial cash investments and approximately $22.6 million in cash and shares through so-called "Flips" (reinvestments of distributions).

8

**B.  In the Alternative, the Diverted Asset Amount Should be Subject to Forfeiture**

The Criminal Defendants used approximately $263.7 million from the Total Amount Invested to acquire Investor Shares (the "**Investor Share Acquisition Costs**").[16]  I am aware that the term "proceeds" in 18 U.S.C. § 981(a)(1)(C) is defined in 18 U.S.C. § 981(a)(2)(A) and (B), and that the amount to be forfeited may, in part, be dependent on which subpart in Section 981(a)(2) is deemed applicable. *See, e.g., U.S. v. Mahaffy*, 693 F.3d 113, at *136-138 (2d Cir. 2012); *U.S. v. Milton*, 2024 WL 779210, at *3-6 (S.D.N.Y. Feb 26, 2024) (discussing cases).  If for any reason the Investor Share Acquisition Costs of $263.7 million are not deemed "proceeds" for purposes of 18 U.S.C. § 981(a)(2), and are not included in the Forfeiture Amount, then I respectfully submit that the Forfeiture Amount should be the Diverted Asset Amount of $130.2 million.

Like the Total Amount Invested, the Diverted Asset Amount represents property "tainted by the offense" that was "actually acquired" by each of the Criminal Defendants through their collective control of StraightPath, and it is appropriate that each Criminal Defendant is subject to forfeiture until the entirety of the Diverted Asset Amount is recovered.

**C.  In the Alternative, the Individually Received Amount Should be Subject to Forfeiture**

If the Diverted Asset Amount is not adopted as the Forfeiture Amount, then I respectfully submit that the Forfeiture Amount for each Criminal Defendant should not be less than his or her

---

[16] The Investor Share Acquisition Costs include both the price StraightPath paid for the Investor Shares it "acquired" and associated costs including commission/brokerage costs paid to arms-length third-party brokers, certificate transfer costs and pre-paid overhead/management costs charged by certain SPV investments.

8829367.1

Individually Received Amount, which for each, is the amount of cash and shares he or she received from the criminal conspiracy, directly or through companies understood to be under their ownership and control[17], as follows:

**Brian K. Martinsen: $28,637,908**: Between December 14, 2017 and February 18, 2022, in 192 separate transactions, Brian K. Martinsen received cash payments from StraightPath in the total amount of $25,420,831 and between March 6, 2020 and March 22, 2021, he received shares valued at $3,217,077, for a total of $28,637,908.

**Michael A. Castillero: $27,575,661**: Between October 25, 2017 and February 18, 2022, in 171 separate transactions, Michael A. Castillero received cash payments from StraightPath in the total amount of $24,356,343 and between October 25, 2019 and March 22, 2021, he received shares valued at $3,219,318, for a total of $27,575,661.

**Francine A. Lanaia: $27,551,323**: Between December 14, 2017 and February 18, 2022, in 154 separate transactions, Francine A. Lanaia received cash payments from StraightPath in the total amount of $24,334,245 and between March 6, 2020 and March 22, 2021, she received shares valued at $3,217,077, for a total of $27,551,322.[18]

---

[17] Cash payments to Mr. Martinsen and Mr. Castillero were remitted to corporations understood to be under their respective ownership and control. Cash payments to Ms. Lanaia were remitted to her directly. Shares were transferred to Mr. Castillero and to Ms. Lanaia directly. Shares were transferred to Mr. Martinsen through a corporation understood to be under his ownership and control.

[18] The Criminal Defendants transferred shares of stock to themselves as follows: (i) on March 22, 2021, each of the Criminal Defendants received 125,000 shares of Palantir Technologies, Inc. ("**Palantir**"), which as of the date of transfer were valued at $24.22/share, so that each Criminal Defendant received Palantir shares valued at $3,027,500; (ii) on November 25, 2020, each of the Criminal Defendants received 5,000 shares of Palantir, which as of the date of transfer were valued at $29.05/share, so that each Criminal Defendant received Palantir shares valued at $145,250; (iii) on March 6, 2020, each of the Criminal Defendants received 1,883 shares of Pinterest, Inc. ("**Pinterest**"), which as of the date of transfer were valued at $18.51/share, so that each Criminal

10

### III.    Restitution Should be Joint and Several

To compensate the Investors for their losses arising from the Criminal Defendants' crimes, it is respectfully requested that the Court recognize the Investors as victims of the Criminal Defendants' misconduct and order restitution in the greatest amount permitted under law. It is further respectfully requested that the Criminal Judgments provide for "joint and several" restitution liability as permitted under MVRA. *U.S. v. Yalincak*, 30 F.4th 115, 121-22 (2d Cir. 2022). While in certain cases, apportionment of restitution is appropriate, in this case, each of the Criminal Defendants is equally at fault and each should be equally responsible for payment of the full amount of restitution awarded. *See Yalincak*, 30 F.4th at 121-22.[19]

### A.  The Investors Suffered Losses

The Investors suffered extensive losses as a result of the Criminal Defendants' crimes in at least the Diverted Asset Amount of $130.2 million. It would be fair to order restitution in that amount. However, the Criminal Defendants have pointed to certain deposits they made that they contend reduce or eliminate any Investor loss.

---

Defendant received Pinterest shares valued at $34,854, and (vi) the Criminal Defendants each received 263 shares of Lyft, Inc. valued as of the date of transfer, which for Mr. Castillero totaled $11,714 (October 25, 2019) and for each of Mr. Martinsen and Ms. Lanaia totaled $9,473 (March 6, 2020). All share values are based on pricing data from Yahoo Financial (https://finance.yahoo.com) for the dates in issue.

[19] *Yalincak*, 30 F.4th at 122: "… Congress has vested the district court with considerable discretion in fashioning restitution orders. The statute governing the procedure for issuing and enforcing restitution orders provides that if the district court 'finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.' 18 U.S.C. § 664(h) (made applicable to the MVRA by 18 U.S.C. § 3663A(d)."

11

8829367.1

Escrow Funds: In the Civil Action, the Criminal Defendants have indicated that Investor losses could never be greater than $14 to $15 million, the estimated amount to cure StraightPath's Share Shortfall, and claiming that they satisfied those losses by remitting approximately $15.2 million to an escrow account (the "**Escrow Account**") under my control as Receiver (the "**Escrow Funds**").[20]

The Criminal Defendants did remit the Escrow Funds to the Escrow Account. Further, as expressly permitted by the Plan, as Receiver, I distributed net Escrow Funds, *pro rata*, to all eligible Investors in accordance with the Plan.[21] However, Investor losses far exceed the $14 to $15 million the Criminal Defendants appear to claim.

Rather, as discussed above, the Criminal Defendants siphoned the Diverted Asset Amount of $130.2 million, creating an embedded Investor loss. Even had each and every StraightPath investment garnered substantial gains, the Investors would still be shortchanged, of both the amount diverted that should have been invested for them, and the gains on the shares that never were acquired for them. As noted, the Criminal Defendants' diversion created a "hole" that cannot be "filled" by Pre-IPO Companies "going public" or distributions from the Receivership. Restitution is needed to remediate this loss.[22]

---

[20] Civil Action Docket No. 25, at 3, 21.

[21] The amount of Escrow Funds distributed was net of certain tax reserves under the Plan and the payment of certain administrative costs as permitted by order of the Civil Action Court.

[22] Moreover, as noted, certain Investors suffered losses *in addition to* the diversion of assets. Perhaps most compelling are those Investors who were unaccredited, unsophisticated and vulnerable who were inveigled to invest their life savings in highly speculative Pre-IPO Shares they could not afford. The Criminal Defendants, each of whom had been long careers in the securities industry, certainly should have known that those Investors should never have been part of StraightPath to begin with. Nonetheless, as the jury verdict establishes, together with their Sales

However, the Criminal Defendants did remit the Escrow Funds of approximately $15.2 million to the Receivership, and accordingly, for restitution purposes, it may be deemed appropriate to deduct the Escrow Funds from the Diverted Asset Amount. In that event, the Restitution Amount would be decreased to approximately $115.0 million. ($130.2 million *less* $15.2 million *equals* $115.0 million.)

Martinsen Remittance: Another amount to which the Criminal Defendants have pointed is Mr. Martinsen's pre-Receivership remittance of $3,456,300 to StraightPath, used to purchase shares of Rubrik Inc. (the **"Martinsen Remittance"**).[23] However, the Martinsen Remittance should not reduce the Restitution Amount. The Criminal Defendants have already been given "credit" for the Martinsen Remittance – the Martinsen Remittance was already included when determining the Investor Share Acquisition Costs of $263.7 million. Deducting the Martinsen Remittance again would amount to double counting which should not occur.

In the event, however, that the Court determines that the Martinsen Remittance should be deducted, the Restitution Amount net of both the Escrow Funds and the Martinsen Remittance would be approximately $111.5 million.

Summary: The calculations discussed above are set forth in the following chart:

---

Agents, the Criminal Defendants used boiler room tactics to sell unsuitable investments to unsuspecting members of the public.

[23] Civil Action Docket No. 20, at 2.

8829367.1

Restitution Amounts: Alternatives

| Diverted Asset Amount | $130.2 million |
|---|---|
| If reduced by the Escrow Funds of $15.2 million | $115.0 million |
| If further reduced by the Martinsen Remittance of $3,456,300 | $111.5 million |

## B.  The Surplus Shares

Although the Criminal Defendants did not acquire all Pre-IPO Shares for the Investors, resulting in the Share Shortfall, the Criminal Defendants did acquire other Pre-IPO Shares which the Criminal Defendants have contended were acquired for their benefit, not the Investors' (the "**Surplus Shares**").[24] Unlike the Martinsen Remittance, the acquisition costs of the Surplus Shares (approximately $13.8 million) were not included when determining the Investor Share Acquisition Costs — the Surplus Shares were not Investor Shares but were Pre-IPO Shares acquired by StraightPath, allegedly for the Criminal Defendants' benefit, but using Investor funds or the proceeds thereof.  As such, the Surplus Shares are the definition of diverted assets – shares the Investors did not seek to acquire but were purchased by StraightPath for the benefit of the Criminal Defendants. Under these circumstances, it is respectfully submitted that the Surplus Shares should not reduce the Restitution Amount.

---

[24] *See* the Criminal Defendants initial comments to the Plan, asserting: "The Plan Proposes to Liquidate and Distribute Surplus Shares Even Though Investors Have No Expectation or Interest in Those Shares." Civil Action Docket No. 394-4 at 8-9. *See also* Civil Action Docket No. 25, at 17.

8829367.1

However, I recognize that the Receivership Entities held certain Surplus Shares as of the Receivership Date and that the Plan Approval Order provides that those Surplus Shares are property of the Receivership Estate. [Civil Action Docket No. 408 at 8.]  Of the fifteen (15) Pre-IPO Companies whose shares comprised the Surplus Shares, six (6) had previously "gone public" as of the Receivership Date, and their shares delivered to StraightPath for the benefit of the Criminal Defendants, and nine (9) remained private, and their shares were held by the Receivership entities as of the Receivership Date (the "**Remaining Surplus Shares**").

Of a total of $13.8 million in acquisition costs for *all* Surplus Shares, StraightPath's acquisition costs for the Remaining Surplus Shares were approximately $11.9 million.  Although the Investors did not authorize the use of their funds for the purchase of the Remaining Surplus Shares, the Court might determine that given the holding of the Plan Approval Order, the Remaining Surplus Shares should be deemed to be Investor Shares and the costs of their purchase no longer deemed to be diverted assets but instead, included in the Investor Share Acquisition Costs.  In that event, the Diverted Asset Amount – the starting point for calculation of the Restitution Amount – would be reduced from $130.2 million to $118.3 million ($130.2 million *less* $11.9 million *equals* $118.3 million), and any deductions arising from the Escrow Funds or the Martinsen Remittance would result in further reductions to the Restitution Amount, as set forth below:

Restitution Amounts: Inclusion of Remaining Surplus Share Acquisition Costs

| | |
|---|---|
| Diverted Asset Amount, as reduced by acquisition costs of Remaining Surplus Shares of $11.9 million | $118.3 million |
| If reduced by the Escrow Funds of $15.2 million | $103.1 million |
| If further reduced by the Martinsen Remittance of $3,456,300 | $99.6 million |

15

## C.  UiPath Refunds Should Not Reduce the Restitution Amount

Between January 2021 and March 2021, StraightPath received $25.6 million in Investor deposits for the acquisition of Pre-IPO Shares in UiPath. However, StraightPath never acquired Pre-IPO Shares in UiPath and was forced to return the invested capital to those Investors that did not agree to reinvest their capital to other StraightPath investments (the "**UiPath Refunds**"). The UiPath Refunds should not reduce the Restitution Amount. The UiPath Refunds have already been excluded from the amounts set forth in this Victim Impact Statement – the Total Amount Invested, the Investor Share Acquisition Costs, the acquisition costs of the Remaining Surplus Shares and the amount of the Share Shortfall, are all net of any amounts StraightPath refunded to redeeming Investors, including the UiPath Refunds.  As such, reducing the Restitution Amount by the UiPath Refunds would be a duplicative deduction and would understate the harm to Investors.

## D.  Pro Rata Distribution

As noted, as part of my duties as Receiver, I have already made *pro rata* distributions of Receivership property to over 1,790 Investors.[25]  I am prepared to act similarly with respect to the Restitution Amount, to distribute those funds to Investors, *pro rata* on a net investment basis, i.e., to reflect all amounts each Investor invested in StraightPath and all amounts received by the Investor on account of those investments.  That way, each Investor will only receive a *pro rata* share of the Restitution Amount based on that Investor's loss.

---

[25]  The Plan includes two distribution components, "Silo" and "Pot".  The "Pot" component distributes cash proceeds to all eligible Investors and Claimants, *pro rata*, on a net investment basis.

8829367.1

## IV.    Every Investor Deserves Recognition as a Victim

The harm from the Criminal Defendants' crimes falls on each of the more than 2,000 Investors. Each is a victim of the Criminal Defendants' crimes. The Court's recognition of each Investor as a victim, and the use of the Receivership as the mechanism for distribution of restitution, will ensure that any recovery serves victims of the Criminal Defendants' misconduct.

Dated: April 6, 2026
New York, New York

_____
Melanie L. Cyganowski, as Receiver

17

8829367.1